# ALLIED CHEMICAL & ALKALI WORKERS OF AMERICA, LOCAL UNION NO. 1 *v.* PITTSBURGH PLATE GLASS CO., CHEMICAL DIVISION, ET AL.

No. 70–32.   Argued October 20, 1971—Decided December 8, 1971*

---

*Together with No. 70–39, *National Labor Relations Board* v. *Pittsburgh Plate Glass Co., Chemical Division, et al.,* also on certiorari to the same court.

*Mortimer Riemer* argued the cause for petitioner in No. 70–32. With him on the brief was *Lawrence M.*

*Oberdank. Norton J. Come* argued the cause for petitioner in No. 70–39. With him on the brief were *Solicitor General Griswold, Richard B. Stone, Arnold Ordman, Dominick L. Manoli,* and *Nancy M. Sherman.*

*Guy Farmer* argued the cause for respondents in both cases. With him on the brief was *Nicholas R. Criss, Jr.*

Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll, Laurence Gold, Thomas E. Harris,* and *Stephen I. Schlossberg* for the American Federation of Labor and Congress of Industrial Organizations et al., and by *Harold Edgar, David H. Marlin,* and *Robert J. Mozer* for the National Council of Senior Citizens.

Briefs of *amici curiae* urging affirmance were filed by *Milton A. Smith, Lawrence M. Cohen,* and *Gerard C. Smetana* for the Chamber of Commerce of the United States; by *Lambert H. Miller* and *Richard D. Godown* for the National Association of Manufacturers of the United States; and by *William C. Treanor* and *John W. Whittlesey* for Union Carbide Corp.

Mr. Justice Brennan delivered the opinion of the Court.

Under the National Labor Relations Act, as amended, mandatory subjects of collective bargaining include pension and insurance benefits for active employees,[1] and an employer's mid-term unilateral modification of such benefits constitutes an unfair labor practice.[2] This cause

---

[1] See, *e. g., NLRB* v. *Black-Clawson Co.,* 210 F. 2d 523 (CA6 1954) (dictum); *NLRB* v. *General Motors Corp.,* 179 F. 2d 221 (CA2 1950); *W. W. Cross & Co.* v. *NLRB,* 174 F. 2d 875 (CA1 1949); *Inland Steel Co.* v. *NLRB,* 170 F. 2d 247 (CA7 1948).

[2] See, *e. g., NLRB* v. *Scam Instrument Corp.,* 394 F. 2d 884 (CA7 1968). Cf., *e. g., NLRB* v. *Huttig Sash & Door Co.,* 377 F. 2d 964 (CA8 1967); *C & S Industries, Inc.,* 158 N. L. R. B. 454 (1966). See also *NLRB* v. *Katz,* 369 U. S. 736 (1962).

presents the question whether a mid-term unilateral modification that concerns, not the benefits of active employees, but the benefits of already retired employees also constitutes an unfair labor practice. The National Labor Relations Board, one member dissenting, held that changes in retired employees' retirement benefits are embraced by the bargaining obligation and that an employer's unilateral modification of them constitutes an unfair labor practice in violation of §§ 8 (a)(5) and (1) of the Act. 177 N. L. R. B. 911 (1969).[3] The Court of Appeals for the Sixth Circuit disagreed and refused to enforce the Board's cease-and-desist order, 427 F. 2d 936 (1970). We granted certiorari, 401 U. S. 907 (1971). We affirm the judgment of the Court of Appeals.

## I

Since 1949, Local 1, Allied Chemical and Alkali Workers of America, has been the exclusive bargaining representative for the employees "working" on hourly rates of pay at the Barberton, Ohio, facilities of respondent Pittsburgh Plate Glass Co.[4] In 1950, the Union and the Company negotiated an employee group health insurance plan, in which, it was orally agreed, retired employees could participate by contributing the required

---

[3] The Board has since adhered to its decision in: *Union Carbide Corp.-Linde Div.*, 76 L. R. R. M. 1585 (1971); *Westinghouse Electric Corp.*, 76 L. R. R. M. 1451 (1971); *Union Carbide Corp.*, 75 L. R. R. M. 1548 (1970); and *Hooker Chemical Corp.*, 75 L. R. R. M. 1357 (1970).

[4] The Labor Board's direction of election described the bargaining unit as: "all employees of the Employer's plant and limestone mine at Barberton, Ohio, *working* on hourly rates, including group leaders who *work* on hourly rates of pay, but excluding salaried employees and supervisors . . . ." (Emphasis supplied.) The Union was re-certified in 1970, after the Board's decision in this cause, with the same unit description embracing only employees working on hourly rates.

premiums, to be deducted from their pension benefits. This program continued unchanged until 1962, except for an improvement unilaterally instituted by the Company in 1954 and another improvement negotiated in 1959.

In 1962 the Company agreed to contribute two dollars per month toward the cost of insurance premiums of employees who retired in the future and elected to participate in the medical plan. The parties also agreed at this time to make 65 the mandatory retirement age. In 1964 insurance benefits were again negotiated, and the Company agreed to increase its monthly contribution from two to four dollars, applicable to employees retiring after that date and also to pensioners who had retired since the effective date of the 1962 contract. It was agreed, however, that the Company might discontinue paying the two-dollar increase if Congress enacted a national health program.

In November 1965, Medicare, a national health program, was enacted, 79 Stat. 291, 42 U. S. C. § 1395 *et seq.* The 1964 contract was still in effect, and the Union sought mid-term bargaining to renegotiate insurance benefits for retired employees. The Company responded in March 1966 that, in its view, Medicare rendered the health insurance program useless because of a non-duplication-of-benefits provision in the Company's insurance policy, and stated, without negotiating any change, that it was planning to (a) reclaim the additional two-dollar monthly contribution as of the effective date of Medicare; (b) cancel the program for retirees; and (c) substitute the payment of the three-dollar monthly subscription fee for supplemental Medicare coverage for each retired employee.[5]

---

[5] Hospital benefits under Medicare are provided automatically to any social security annuitant 65 or over. Medical benefits are optional and, at the relevant time period, required a monthly three-dollar payment per person.

The Union acknowledged that the Company had the contractual right to reduce its monthly contribution, but challenged its proposal unilaterally to substitute supplemental Medicare coverage for the negotiated health plan. The Company, as it had done during the 1959 negotiations without pressing the point, disputed the Union's right to bargain in behalf of retired employees, but advised the Union that upon further consideration it had decided not to terminate the health plan for pensioners. The Company stated instead that it would write each retired employee, offering to pay the supplemental Medicare premium if the employee would withdraw from the negotiated plan. Despite the Union's objections the Company did circulate its proposal to the retired employees, and 15 of 190 retirees elected to accept it. The Union thereupon filed unfair labor practice charges.

The Board held that although the Company was not required to engage in mid-term negotiations, the benefits of already retired employees could not be regarded as other than a mandatory subject of collective bargaining. The Board reasoned that "retired employees are 'employees' within the meaning of the statute for the purposes of bargaining about changes in their retirement benefits . . . ." 177 N. L. R. B., at 912. Moreover, "retirement status is a substantial connection to the bargaining unit, for it is the culmination and the product of years of employment." *Id.*, at 914. Alternatively, the Board considered "bargaining about changes in retirement benefits for retired employees" as "within the contemplation of the statute because of the interest which active employees have in this subject . . . ." *Id.*, at 912. Apparently in support of both theories, the Board noted that "[b]argaining on benefits for workers already retired is an established aspect of current labor-management relations." *Id.*, at 916. The Board also held that the

Company's "establishment of a fixed, additional option in and of itself changed the negotiated plan of benefits" contrary to §§ 8 (d) and 8 (a)(5) of the Act. *Id.,* at 918. Accordingly, the Company was ordered to cease and desist from refusing to bargain collectively about retirement benefits and from making unilateral adjustments in health insurance plans for retired employees without first negotiating in good faith with the Union. The Company was also required to rescind, at the Union's request, any adjustment it had unilaterally instituted and to mail and post appropriate notices.[6]

## II

Section 1 of the National Labor Relations Act declares the policy of the United States to protect commerce "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment . . . ." 49 Stat. 449, as amended, 29 U. S. C. § 151. To effectuate this policy, § 8 (a)(5) provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section" 9 (a). 49 Stat. 453, as amended, 29 U. S. C. § 158 (a)(5). Section 8 (d), in turn, defines "to bargain

---

[6] The Board found that the Company had violated not only § 8 (a)(5) but § 8 (a)(1), and the Board framed its cease-and-desist order accordingly. Section 8 (a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7, which include "the right to self-organization . . . [and] to bargain collectively through representatives of their own choosing . . . ." 49 Stat. 452, as amended, 29 U. S. C. §§ 158 (a)(1), 157. However, the § 8 (a) (1) violation derives from the alleged § 8 (a)(5) misconduct and, therefore, presents no separate issues.

collectively" as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 61 Stat. 142, 29 U. S. C. § 158 (d). Finally, § 9 (a) declares: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 49 Stat. 453, as amended, 29 U. S. C. § 159 (a).

Together, these provisions establish the obligation of the employer to bargain collectively, "with respect to wages, hours, and other terms and conditions of employment," with "the representatives of his employees" designated or selected by the majority "in a unit appropriate for such purposes." This obligation extends only to the "terms and conditions of employment" of the employer's "employees" in the "unit appropriate for such purposes" that the union represents. See, e. g., Mine Workers v. Pennington, 381 U. S. 657, 666 (1965); NLRB v. Borg-Warner Corp., 356 U. S. 342 (1958); Packard Co. v. NLRB, 330 U. S. 485 (1947); Phelps Dodge Corp. v. NLRB, 313 U. S. 177, 192 (1941) (dictum); Pittsburgh Glass Co. v. NLRB, 313 U. S. 146 (1941). The Board found that benefits of already retired employees fell within these constraints on alternative theories. First, it held that pensioners are themselves "employees" and members of the bargaining unit, so that their benefits are a "term and condition" of their employment.[7]

---

[7] The Court of Appeals below seems to have read the Board's decision as holding that retirees might be considered "employees"

The Court of Appeals, in contrast, held "that retirees are not 'employees' within the meaning of section 8 (a) (5) and . . . the Company was under no constraint to collectively bargain improvements in their benefits with the Union." 427 F. 2d, at 942. The court reasoned, *first,* "[r]etirement with this Company, as with most other companies, is a complete and final severance of employment. Upon retirement, employees are completely removed from the payroll and seniority lists, and thereafter they perform no services for the employer, are paid no wages, are under no restrictions as to other employment or activities, and have no rights or expectations of reemployment," *id.,* at 944; and, *second,* "[i]t has repeatedly been held that the scope of the bargaining unit controls the extent of the bargaining obligation . . . . [And] the unit certified by the Board as appropriate was composed . . . only of presumably active employees . . . ." *Id.,* at 945. For the reasons that follow we agree with the Court of Appeals.

*First.* Section 2 (3) of the Act provides:

> "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment . . . ." 49 Stat. 450, as amended, 29 U. S. C. § 152 (3).

---

under the Act, but not as finding that the retirees in this case were. See 427 F. 2d, at 944 n. 14. We do not read the Board's decision that way. The Board said: "For the reasons stated above, the 'underlying economic facts' of this case persuade us that Congress intended to confer employee status on retired employees with respect to health insurance plans affecting them." 177 N. L. R. B. 911, 914.

We have repeatedly affirmed that the task of determining the contours of the term "employee" "has been assigned primarily to the agency created by Congress to administer the Act." *NLRB* v. *Hearst Publications,* 322 U. S. 111, 130 (1944). See also *Iron Workers* v. *Perko,* 373 U. S. 701, 706 (1963); *NLRB* v. *Atkins & Co.,* 331 U. S. 398 (1947). But we have never immunized Board judgments from judicial review in this respect. "[T]he Board's determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law." *NLRB* v. *Hearst Publications, supra,* at 131.

In this cause we hold that the Board's decision is not supported by the law. The Act, after all, as § 1 makes clear, is concerned with the disruption to commerce that arises from interference with the organization and collective-bargaining rights of "workers"—not those who have retired from the work force. The inequality of bargaining power that Congress sought to remedy was that of the "working" man, and the labor disputes that it ordered to be subjected to collective bargaining were those of employers and their active employees. Nowhere in the history of the National Labor Relations Act is there any evidence that retired workers are to be considered as within the ambit of the collective-bargaining obligations of the statute.

To the contrary, the legislative history of § 2 (3) itself indicates that the term "employee" is not to be stretched beyond its plain meaning embracing only those who work for another for hire. In *NLRB* v. *Hearst Publications, supra,* we sustained the Board's finding that newsboys were "employees" rather than independent contractors. We said that "the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' . . . leaves no doubt that its applicability is to be determined broadly, in

doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications." The term "employee" "must be understood with reference to the purpose of the Act and the facts involved in the economic relationship." 322 U. S., at 129. Congress reacted by specifically excluding from the definition of "employee" "any individual having the status of an independent contractor." The House, which proposed the amendment, explained:

"An 'employee,' according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, . . . means someone who works for another for hire. But in the case of *National Labor Relations Board* v. *Hearst Publications, Inc.* . . . , the Board . . . held independent merchants who bought newspapers from the publisher and hired people to sell them to be 'employees.' The people the merchants hired to sell the papers were 'employees' of the merchants, but holding the merchants to be 'employees' of the publisher of the papers was most far reaching. It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up. In the law, there always has been a difference, and a big difference, between 'employees' and 'independent contractors.' 'Employees' work for wages or salaries under direct supervision. . . . It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not far-fetched meanings but ordinary

meanings." H. R. Rep. No. 245, 80th Cong., 1st Sess., 18 (1947) (emphasis added).

See also 93 Cong. Rec. 6441–6442; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 32–33 (1947). The 1947 Taft-Hartley revision made clear that general agency principles could not be ignored in distinguishing "employees" from independent contractors. *NLRB* v. *United Insurance Co.*, 390 U. S. 254, 256 (1968). Although *Hearst Publications* was thus repudiated, we do not think its approach has been totally discredited. In doubtful cases resort must still be had to economic and policy considerations to infuse § 2 (3) with meaning. But, as the House comments quoted above demonstrate, this is not a doubtful case. The ordinary meaning of "employee" does not include retired workers; retired employees have ceased to work for another for hire.

The decisions on which the Board relied in construing § 2 (3) to the contrary are wide of the mark. The Board enumerated "unfair labor practice situations where the statute has been applied to persons who have not been initially hired by an employer or whose employment has terminated. Illustrative are cases in which the Board has held that applicants for employment and registrants at hiring halls—who have never been hired in the first place—as well as persons who have quit or whose employers have gone out of business are 'employees' embraced by the policies of the Act." 177 N. L. R. B., at 913 (citations omitted). Yet all of these cases involved people who, unlike the pensioners here, were members of the active work force available for hire and at least in that sense could be identified as "employees." No decision under the Act is cited, and none to our knowledge exists, in which an individual who has ceased work without expectation of further employment has been held to be an "employee."

The Board also found support for its position in decisions arising under § 302 (c)(5) of the Labor Management Relations Act, 61 Stat. 157, 29 U. S. C. § 186 (c) (5). Section 302 prohibits, *inter alia,* any payment by an employer to any representative of any of his employees. Subsection (c)(5) provides an exemption for payments to an employee trust fund established "for the sole and exclusive benefit of the employees of such employer" and administered by equal numbers of representatives of the employer and employees. The word "employee," as used in that provision, has been construed to include "current employees and persons who were . . . current employees but are now retired." *Blassie* v. *Kroger Co.,* 345 F. 2d 58, 70 (CA8 1965).[8] The Board considered that it would be anomalous to hold "that retired employees are not 'employees' whose ongoing benefits are fit subjects of bargaining under Section 8 (a)(5), while under [§ 302 (c)] they are 'employees' for the purpose of administering the same health insurance benefits. It would create the further anomaly that a union would not be entitled to act as the representative of retired employees under Section 8 (a)(5), while subject to an explicit statutory duty to act as their representative under [§ 302 (c)]." 177 N. L. R. B., at 915.[9]

Yet the rationale of *Blassie* is not at all in point. The question there was simply whether under § 302 (c)(5) retirees remain eligible for benefits of trust funds estab-

---

[8] See also *Garvison* v. *Jensen,* 355 F. 2d 487 (CA9 1966); *Local No. 688, Int'l Bro. of Teamsters* v. *Townsend,* 345 F. 2d 77 (CA8 1965). Section 501 (3) of the Labor Management Relations Act provides that the term "employee" as used in that legislation has the same meaning as when used in the National Labor Relations Act. 61 Stat. 161, 29 U. S. C. § 142 (3).

[9] Although the Board referred to § 302 (b) rather than § 302 (c), it is clear from the context of the Board's discussion that the latter citation was the one intended.

lished during their active employment. The conclusion that they do was compelled by the fact that the contrary reading of the statute would have made illegal contributions to pension plans, which the statute expressly contemplates in subsections (A) and (C).[10] No comparable situation exists in this case. Furthermore, there is no anomaly in the conclusion that retired workers are "employees" within § 302 (c) (5) entitled to the benefits negotiated while they were active employees, but are not "employees" whose ongoing benefits are embraced by the bargaining obligation of § 8 (a) (5). Contrary to the Board's assertion, the union's role in the administration of the fund is of a far different order from its duties as collective-bargaining agent. To accept the Board's reasoning that the union's § 302 (c) (5) responsibilities dictate the scope of the § 8 (a) (5) collective-

---

[10] Section 302 (c) (5) provides an exemption:

"with respect to money or other thing of value paid to a trust fund established by such [employee] representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents . . . : *Provided,* That (A) such payments are held in trust for the purpose of paying . . . for the benefit of employees, their families and dependents, for medical or hospital care, *pensions on retirement or death of employees,* compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; . . . and (C) *such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities . . . ."* (Emphasis supplied.)

The express reference to pensions in subsections (A) and (C) requires that the phrase "for the sole and exclusive benefit of the employees of such employer" in the introductory clause to § 302 (c) (5) be read to include retirees.

bargaining obligation would be to allow the tail to wag the dog.[11]

*Second.* Section 9 (a) of the Labor Relations Act accords representative status only to the labor organization selected or designated by the majority of employees in a "unit appropriate" "for the purposes of collective bargaining." Section 9 (b) goes on to direct the Labor Board to "decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ." 49 Stat. 453, as amended, 29 U. S. C. § 159 (b). We have always recognized that, in making these determinations, the Board is accorded broad discretion. See *NLRB* v. *Hearst Publications,* 322 U. S., at 132–135; *Pittsburgh Glass Co.* v. *NLRB,* 313 U. S. 146 (1941). Moreover, the Board's findings of fact, if supported by substantial evidence, are conclusive. National Labor Relations Act, § 10 (e), 49 Stat. 454, as amended, 29 U. S. C. § 160 (e). But the Board's powers in respect of unit determinations are not without limits, and if its

---

[11] The Board adds an argument in its brief for construing "employee" in §§ 302 (c) (5) and 8 (a) (5) *in pari materia.* Not to read the term that way, the Board contends, "would frequently interject into welfare plan negotiations the troublesome threshold question whether particular proposals involved the administration of the written agreement, in which case the union would be entitled to represent retired employees, or its renegotiation, in which case . . . it would not." However, nothing we hold today precludes permissive bargaining over the benefits of already retired employees. Moreover, to the extent that "the troublesome threshold question" posited by the Board may arise, it is no different from the task of distinguishing the distinct functions of contract application and contract negotiation which employers and labor organizations are already accustomed to addressing.

decision "oversteps the law," *Packard Co.* v. *NLRB,* 330 U. S., at 491, it must be reversed.

In this cause, in addition to holding that pensioners are not "employees" within the meaning of the collective-bargaining obligations of the Act, we hold that they were not and could not be "employees" included in the bargaining unit. The unit determined by the Board to be appropriate was composed of "employees of the Employer's plant . . . working on hourly rates, including group leaders who work on hourly rates of pay . . . ." Apart from whether retirees could be considered "employees" within this language, they obviously were not employees "working" or "who work" on hourly rates of pay. Although those terms may include persons on temporary or limited absence from work, such as employees on military duty, it would utterly destroy the function of language to read them as embracing those whose work has ceased with no expectation of return.

In any event, retirees could not properly be joined with the active employees in the unit that the Union represents. "As a standard, the Board must comply . . . with the requirement that the unit selected must be one to effectuate the policy of the act, the policy of efficient collective bargaining." *Pittsburgh Glass Co.* v. *NLRB, supra,* at 165. The Board must also exercise care that the rights of employees under § 7 of the Act "to self-organization . . . [and] to bargain collectively through representatives of their own choosing" are duly respected. In line with these standards, the Board regards as its primary concern in resolving unit issues "to group together only employees who have substantial mutual interests in wages, hours, and other conditions of employment." 15 NLRB Ann. Rep. 39 (1950). Such a mutuality of interest serves to assure the coherence among employees necessary for efficient collective bargaining and at the same time to prevent a function-

ally distinct minority group of employees from being submerged in an overly large unit. See *Kalamazoo Paper Box Corp.*, 136 N. L. R. B. 134, 137 (1962).

Here, even if, as the Board found, active and retired employees have a common concern in assuring that the latter's benefits remain adequate, they plainly do not share a community of interests broad enough to justify inclusion of the retirees in the bargaining unit. Pensioners' interests extend only to retirement benefits, to the exclusion of wage rates, hours, working conditions, and all other terms of active employment. Incorporation of such a limited-purpose constituency in the bargaining unit would create the potential for severe internal conflicts that would impair the unit's ability to function and would disrupt the processes of collective bargaining. Moreover, the risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits.[12]

But we need not rely on our own assessment of the probable consequences of including retirees in the bargaining unit to conclude that the resulting unit would

---

[12] The Board argues in its brief that retirees will be at a greater disadvantage if they are required to bargain individually with the employer than if they are represented by the union. The argument assumes that collective bargaining over the benefits of already retired employees would be a one-way street in their favor. The assumption, however, is not free from doubt, as the Board itself recognized in its opinion, see 177 N. L. R. B., at 917, in declining to take a position on the question. Compare *Elgin, J. & E. R. Co.* v. *Burley*, 325 U. S. 711 (1945), adhered to on rehearing, 327 U. S. 661 (1946), with § 9 (a) of the National Labor Relations Act. In any event, in representing retirees in the negotiation of retirement benefits, the union would be bound to balance the interests of all its constituents, with the result that the interests of active employees might at times be preferred to those of retirees. See Recent Developments, 68 Mich. L. Rev. 757, 766–767, 772–773 (1970).

be inappropriate. The Board itself has previously recognized that retirees do not have a sufficient interest to warrant participation in the election of a collective-bargaining agent. In *Public Service Corp. of New Jersey,* 72 N. L. R. B. 224, 229–230 (1947), for example, the Board stated:

"We have considerable doubt as to whether or not pensioners are employees within the meaning of Section 2 (3) of the Act, since they no longer perform any work for the Employers, and have little expectancy of resuming their former employment. In any event, even if pensioners were to be considered as employees, we believe that they lack a substantial community of interest with the employees who are presently in the active service of the Employers. Accordingly, we find that pensioners are ineligible to vote in the election." [13]

The Board argues, however, that the pensioners' ineligibility to vote is not dispositive of their right to membership in the bargaining unit, since the franchise and the right to membership depend upon different levels of interest in the unit.[14] Yet in *W. D. Byron & Sons of Maryland, Inc.,* 55 N. L. R. B. 172, 174–175 (1944), which the Board found controlling in *Public Service Corp. of New Jersey,* see 72 N. L. R. B., at 230 n. 10, the Board not merely held ineligible to vote, but expressly

---

[13] See also *J. S. Young Co.,* 55 N. L. R. B. 1174 (1944). The Board indicates in its brief that it adheres to these decisions. Indeed, we are informed by the Company that the Board excluded retirees from the representation election that it conducted following its decision in this case. See n. 4, *supra.*

[14] The Board on that theory at one time withheld the right to vote from certain employees who were, nonetheless, acknowledged unit members. See, *e. g., H. P. Wasson & Co.,* 105 N. L. R. B. 373 (1953). However, that policy was subsequently abandoned. See *Post Houses, Inc.,* 161 N. L. R. B. 1159, 1160 n. 1, 1172 (1966).

excluded from the bargaining unit pensioners who had little expectation of further employment. In any event, it would be clearly inconsistent with the majority rule principle of the Act to deny a member of the unit at the time of an election a voice in the selection of his bargaining representative.[15] The Board's own holdings thus compel the conclusion that a unit composed of active and retired workers would be inappropriate.

*Third.* The Board found that bargaining over pensioners' rights has become an established industrial prac-

---

[15] Section 7 of the Act declares that "[e]mployees shall have the right . . . to bargain collectively through representatives of their own choosing . . . ." Section 9 (a), in turn, provides that "[r]epresentatives designated or selected . . . by the majority of the employees in a unit . . . shall be the exclusive representatives of all the employees in such unit . . . ." The majority rule principle that the Act thus establishes was adopted after considerable public controversy. Both the House and the Senate committees that reported out the Wagner bill were at pains to explain that the principle not only was necessary for the effective functioning of collective bargaining but was sanctioned by the philosophy of democratic institutions. Moreover, they carefully reviewed the provisions that the Act establishes to protect minority groups within the bargaining unit, such as the prohibition on discrimination in favor of union members. See H. R. Rep. No. 972, 74th Cong., 1st Sess., 18–20 (1935); S. Rep. No. 573, 74th Cong., 1st Sess., 13–14 (1935). The language of §§ 7 and 9 (a), coupled with this legislative history, makes plain that all unit members are enfranchised.

This is not to say that the Board is without power to develop reasonable regulations governing who may vote in Board-conducted elections. The House committee expressly indicated that the Board may "make and publish appropriate rules governing the conduct of elections and determining who may participate therein." H. R. Rep. No. 972, *supra*, at 20. Thus, the Board may, for example, withhold the ballot from employees hired after the election eligibility date. As Member Zagoria explained in his dissent from the Board's decision below, that rule "provides an administrative cutoff date for convenience in conducting elections, and to prevent payroll padding and other possible abuses." 177 N. L. R. B., at 919.

tice. But industrial practice cannot alter the conclusions that retirees are neither "employees" nor bargaining unit members. The parties dispute whether a practice of bargaining over pensioners' benefits exists and, if so, whether it reflects the views of labor and management that the subject is not merely a convenient but a mandatory topic of negotiation.[16] But even if industry commonly regards retirees' benefits as a statutory subject of bargaining, that would at most, as we suggested in *Fibreboard Corp.* v. *NLRB*, 379 U. S. 203, 211 (1964), reflect the interests of employers and employees in the subject matter as well as its amenability to the collective-bargaining process; it would not be determinative. Common practice cannot change the law and make into bargaining unit "employees" those who are not.

### III

Even if pensioners are not bargaining unit "employees," are their benefits, nonetheless, a mandatory subject of collective bargaining as "terms and conditions of employment" of the active employees who remain in the unit? The Board held, alternatively, that they are, on the ground that they "vitally" affect the "terms and conditions of employment" of active employees principally by influencing the value of both their current and future benefits. 177 N. L. R. B., at 915.[17] The Board ex-

---

[16] The Company also contends that the record is barren of any evidence to support the Board's findings on industry experience. Even if that is the case, the evidence cited by the Board may have properly been officially noticed. But we need not decide that question in view of our conclusion that the industrial practice that the Board found to exist does not validate its holdings.

[17] The additional interests that the Board found active employees have in pensioners' benefits were properly dealt with by the Court of Appeals below and do not need extended consideration here. The Board stated that "the Union and current employees have a legitimate interest in assuring that negotiated retirement benefits

plained: "It is not uncommon to group active and retired employees under a single health insurance contract with the result that . . . it is the size and experience of the entire group which may determine insurance rates." *Ibid.* Consequently, active employees may "benefit from the membership of retired employees in the group whose participation enlarges its size and might thereby lower costs per participant." *Ibid.* Furthermore, the actual value of future benefits depends upon contingencies, such as inflation and changes in public law, which the parties cannot adequately anticipate and over which they have little or no control. By establishing a practice of repre-

---

are in fact paid and administered in accordance with the terms and intent of their contracts . . . ." 177 N. L. R. B., at 915. That interest is undeniable. But Congress has specifically established a remedy for breaches of collective-bargaining agreements in § 301 of the Labor Management Relations Act. 61 Stat. 156, 29 U. S. C. § 185. See, *e. g., Upholsterers' Int'l Union* v. *American Pad & Textile Co.,* 372 F. 2d 427 (CA6 1967). Similarly, Congress has expressly provided for employee representation in the administration of trust funds under § 302 (c)(5) of that Act. In any event, the question presented is not whether retirement rights are enforceable, but whether they are subject to compulsory bargaining.

The Board also noted "that changes in retirement benefits for retired employees affect the availability of employer funds for active employees." 177 N. L. R. B., at 915. That, again, is quite true. But countless other employer expenditures that concededly are not subjects of mandatory bargaining, such as supervisors' salaries and dividends, have a similar impact. The principle that underlies the Board's argument sweeps with far too broad a brush. The Board does suggest in its brief that pensioners' benefits are different from other employer expenses because they are normally regarded as part of labor costs. The employer's method of accounting, however, hardly provides a suitable basis for distinction. In any case, the impact on active employees' compensation from changes in pensioners' benefits is, like the effect discussed in the text of including retirees under the same health insurance plan as active employees, too insubstantial to bring those changes within the collective-bargaining obligation.

senting retired employees in resolving those contingencies as they arise, active workers can insure that their own retirement benefits will survive the passage of time. This, in turn, the Board contends, facilitates the peaceful settlement of disputes over active employees' pension plans. The Board's arguments are not insubstantial, but they do not withstand careful scrutiny.

Section 8 (d) of the Act, of course, does not immutably fix a list of subjects for mandatory bargaining. See, *e. g., Fibreboard Corp.* v. *NLRB, supra,* at 220–221 (STEWART, J., concurring); *Richfield Oil Corp.* v. *NLRB,* 97 U. S. App. D. C. 383, 389–390, 231 F. 2d 717, 723–724 (1956). But it does establish a limitation against which proposed topics must be measured. In general terms, the limitation includes only issues that settle an aspect of the relationship between the employer and employees. See, *e. g., NLRB* v. *Borg-Warner Corp.,* 356 U. S. 342 (1958). Although normally matters involving individuals outside the employment relationship do not fall within that category, they are not wholly excluded. In *Teamsters Union* v. *Oliver,* 358 U. S. 283 (1959), for example, an agreement had been negotiated in the trucking industry, establishing a minimum rental that carriers would pay to truck owners who drove their own vehicles in the carriers' service in place of the latter's employees. Without determining whether the owner-drivers were themselves "employees," we held that the minimum rental was a mandatory subject of bargaining, and hence immune from state antitrust laws, because the term "was integral to the establishment of a stable wage structure for clearly covered employee-drivers." *United States* v. *Drum,* 368 U. S. 370, 382–383, n. 26 (1962).[18] Similarly,

---

[18] Specifically, we noted in *Oliver,* 358 U. S., at 294:

"[The collective-bargaining agreement constitutes] . . . a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the . . . contract. The

in *Fibreboard Corp.* v. *NLRB, supra,* at 215, we held that "the type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining . . . ." As we said there, *id.,* at 213, "the work of the employees in the bargaining unit was let out piecemeal in *Oliver,* whereas here the work of the entire unit has been contracted out."

The Board urges that *Oliver* and *Fibreboard* provide the principle governing this cause. The Company, on the other hand, would distinguish those decisions on the ground that the unions there sought to protect employees from outside threats, not to represent the interests of third parties. We agree with the Board that the principle of *Oliver* and *Fibreboard* is relevant here; in each case the question is not whether the third-party concern is antagonistic to or compatible with the interests of bargaining-unit employees, but whether it vitally affects the "terms and conditions" of their employment.[19] But we disagree with the Board's assessment of the significance of a change in retirees' benefits to the "terms and conditions of employment" of active employees.

---

inadequacy of a rental which means that the owner makes up his excess costs from his driver's wages not only clearly bears a close relation to labor's efforts to improve working conditions but is in fact of vital concern to the carrier's employed drivers; an inadequate rental might mean the progressive curtailment of jobs through withdrawal of more and more carrier-owned vehicles from service."

[19] This is not to say that application of *Oliver* and *Fibreboard* turns only on the impact of the third-party matter on employee interests. Other considerations, such as the effect on the employer's freedom to conduct his business, may be equally important. See *Fibreboard Corp.* v. *NLRB, supra,* at 217 (STEWART, J., concurring). But we have no occasion in this case to consider what, if any, those considerations may be.

The benefits that active workers may reap by including retired employees under the same health insurance contract are speculative and insubstantial at best. As the Board itself acknowledges in its brief, the relationship between the inclusion of retirees and the overall insurance rate is uncertain. Adding individuals increases the group experience and thereby generally tends to lower the rate, but including pensioners, who are likely to have higher medical expenses, may more than offset that effect. In any event, the impact one way or the other on the "terms and conditions of employment" of active employees is hardly comparable to the loss of jobs threatened in *Oliver* and *Fibreboard*. In *Fibreboard,* after holding that "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment" is a mandatory subject of bargaining, we noted that our decision did "not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy." 379 U. S., at 215. The inclusion of retirees in the same insurance contract surely has even less impact on the "terms and conditions of employment" of active employees than some of the contracting activities that we excepted from our holding in *Fibreboard.*

The mitigation of future uncertainty and the facilitation of agreement on active employees' retirement plans, that the Board said would follow from the union's representation of pensioners, are equally problematical. To be sure, the future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining. Moreover, provisions of those plans to guard against future contingencies are equally subsumed under the collective-bargaining obligation. Under the Board's

theory, active employees undertake to represent pensioners in order to protect their own retirement benefits, just as if they were bargaining for, say, a cost-of-living escalation clause. But there is a crucial difference. Having once found it advantageous to bargain for improvements in pensioners' benefits, active workers are not forever thereafter bound to that view or obliged to negotiate in behalf of retirees again.[20] To the contrary, they are free to decide, for example, that current income is preferable to greater certainty in their own retirement benefits or, indeed, to their retirement benefits altogether. By advancing pensioners' interests now, active employees, therefore, have no assurance that they will be the beneficiaries of similar representation when they retire. The insurance against future contingencies

---

[20] Since retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer. Nothing in *Railroad Trainmen* v. *Howard*, 343 U. S. 768 (1952), is to the contrary. In *Howard* we held that a union may not use the powers accorded it under law for the purposes of racial discrimination even against workers who are not members of the bargaining unit represented by the union. The reach and rationale of *Howard* are a matter of some conjecture. See Cox, The Duty of Fair Representation, 2 Vill. L. Rev. 151, 157–159 (1957). But whatever its theory, the case obviously does not require a union affirmatively to represent nonbargaining unit members or to take into account their interests in making bona fide economic decisions in behalf of those whom it does represent.

This does not mean that when a union bargains for retirees—which nothing in this opinion precludes if the employer agrees—the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. See generally Note, 70 Col. L. Rev. 909, 916–920 (1970). The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed. See *Smith* v. *Evening News Assn.*, 371 U. S. 195, 200–201 (1962); *Lewis* v. *Benedict Coal Corp.*, 361 U. S. 459, 470 (1960).

that they may buy in negotiating benefits for retirees is thus a hazardous and, therefore, improbable investment, far different from a cost-of-living escalation clause that they could contractually enforce in court. See n. 20, *supra*. We find, accordingly, that the effect that the Board asserts bargaining in behalf of pensioners would have on the negotiation of active employees' retirement plans is too speculative a foundation on which to base an obligation to bargain.

Nor does the Board's citation of industrial practice provide any ground for concluding otherwise. The Board states in its brief that "[n]either the bargaining representative nor the active employees . . . can help but recognize that the active employees of today are the retirees of tomorrow—indeed, such a realization undoubtedly underlies the widespread industrial practice of bargaining about benefits of those who have already retired . . . and explains the vigorous interest which the Union has taken in this case." But accepting the Board's finding that the industrial practice exists, we find nowhere a particle of evidence cited showing that the explanation for this lies in the concern of active workers for their own future retirement benefits.

We recognize that "classification of bargaining subjects as 'terms [and] conditions of employment' is a matter concerning which the Board has special expertise." *Meat Cutters* v. *Jewel Tea,* 381 U. S. 676, 685–686 (1965). The Board's holding in this cause, however, depends on the application of law to facts, and the legal standard to be applied is ultimately for the courts to decide and enforce. We think that in holding the "terms and conditions of employment" of active employees to be *vitally* affected by pensioners' benefits, the Board here simply neglected to give the adverb its ordinary meaning. Cf. *NLRB* v. *Brown,* 380 U. S. 278, 292 (1965).

## IV

The question remains whether the Company committed an unfair labor practice by offering retirees an exchange for their withdrawal from the already negotiated health insurance plan. After defining "to bargain collectively" as meeting and conferring "with respect to wages, hours, and other terms and conditions of employment," § 8 (d) of the Act goes on to provide in relevant part that "where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract" except upon (1) timely notice to the other party, (2) an offer to meet and confer "for the purpose of negotiating a new contract or a contract containing the proposed modifications," (3) timely notice to the Federal Mediation and Conciliation Service and comparable state or territorial agencies of the existence of a "dispute," and (4) continuation "in full force and effect [of] . . . all the terms and conditions of the existing contract . . . until [its] expiration date . . . ." [21]

---

[21] Section 8 (d) reads in full:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract

The Board's trial examiner ruled that the Company's action in offering retirees a change in their health plan did not amount to a "modification" of the collective-bargaining agreement in violation of § 8 (d), since the pensioners had merely been given an additional option that they were free to accept or decline as they saw fit.

---

of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

"The duties imposed upon employers, employees, and labor organizations by paragraphs (2)–(4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159 (a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158 to 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer." 29 U. S. C. § 158 (d).

The Board rejected that conclusion on the ground that there were several possible ways of adjusting the negotiated plan to the Medicare provisions and the Company "modified" the contract by unilaterally choosing one of them. The Company now urges, in effect, that we adopt the views of the trial examiner. We need not resolve, however, whether there was a "modification" within the meaning of § 8 (d), because we hold that even if there was, a "modification" is a prohibited unfair labor practice only when it changes a term that is a mandatory rather than a permissive subject of bargaining.

Paragraph (4) of § 8 (d), of course, requires that a party proposing a modification continue "in full force and effect . . . all the terms and conditions of the existing contract" until its expiration. Viewed in isolation from the rest of the provision, that language would preclude any distinction between contract obligations that are "terms and conditions of employment" and those that are not. But in construing § 8 (d), " 'we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 285 (1956) (quoting *United States* v. *Boisdoré's Heirs,* 8 How. 113, 122). See also *NLRB* v. *Lion Oil Co.,* 352 U. S. 282, 288 (1957). Seen in that light, § 8 (d) embraces only mandatory topics of bargaining. The provision begins by defining "to bargain collectively" as meeting and conferring "with respect to wages, hours, and other terms and conditions of employment." It then goes on to state that "the duty to bargain collectively shall also mean" that mid-term unilateral modifications and terminations are prohibited. Although this part of the section is introduced by a "proviso" clause, see n. 21, *supra,* it quite plainly is to be construed *in pari materia* with the preceding definition. Accordingly, just as § 8 (d) defines the obligation to bar-

gain to be with respect to mandatory terms alone, so it prescribes the duty to maintain only mandatory terms without unilateral modification for the duration of the collective-bargaining agreement.[22]

The relevant purpose of § 8 (d) that emerges from the legislative history of the Act together with the text of the provision confirms this understanding. The section stems from the 1947 revision of the Act, an important theme of which was to stabilize collective-bargaining agreements. The Senate bill, in particular, contained provisions in §§ 8 (d) and 301 (a) to prohibit unilateral mid-term modifications and terminations and to confer federal jurisdiction over suits for contract violations. See S. 1126, 80th Cong., 1st Sess., §§ 8 (d), 301 (a). The bill also included provisions to make it an unfair labor practice for an employer or labor organization "to violate the terms of a collective-bargaining agreement." *Id.*, §§ 8 (a)(6), 8 (b)(5). In conference the Senate's proposed §§ 8 (d) and 301 (a) were adopted with relatively few changes. See H. R. Conf. Rep. No. 510, *supra*, at 34–35, 65–66. The provisions to make contract violations an unfair labor practice, on the other hand, were rejected with the explanation that "[o]nce parties have made a collective bargaining contract the

---

[22] In coming to a contrary conclusion, the trial examiner mistakenly relied on *Brotherhood of Painters, Local Union No. 1385*, 143 N. L. R. B. 678 (1963), where the Board held that a union violated § 8 (d) by refusing to execute a written contract containing a permissive term to which it had previously agreed. "The parties did discuss the provision," the Board reasoned, "and for us to hold that the Employers in this case may not insist on the inclusion of this provision in their contract would upset, if not undo, the stabilizing effects of the agreement which was reached after several negotiation meetings." *Id.*, at 680. The union was required to sign the contract at the employers' request, not because § 8 (d) reaches permissive terms, but because the union's refusal obstructed execution of an agreement on mandatory terms. Cf. *NLRB* v. *Katz*, *supra*, n. 2.

enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board." *Id.*, at 42. The purpose of the proscription of unilateral mid-term modifications and terminations in § 8 (d) cannot be, therefore, simply to assure adherence to contract terms. As far as unfair-labor-practice remedies are concerned, that goal was to be achieved through other unfair-labor-practice provisions that were rejected in favor of customary judicial procedures. See *Dowd Box Co.* v. *Courtney,* 368 U. S. 502, 510–513 (1962).

The structure and language of § 8 (d) point to a more specialized purpose than merely promoting general contract compliance. The conditions for a modification or termination set out in paragraphs (1) through (4) plainly are designed to regulate modifications and terminations so as to facilitate agreement in place of economic warfare. Thus, the party desiring to make a modification or termination is required to serve a written notice on the other party, offer to meet and confer, notify mediation and conciliation agencies if necessary, and meanwhile maintain contract relations. Accordingly, we think we accurately described the relevant aim of § 8 (d) when we said in *Mastro Plastics Corp.* v. *NLRB, supra,* at 284, that the provision "seeks to bring about the termination and modification of collective-bargaining agreements without interrupting the flow of commerce or the production of goods . . . ."

If that is correct, the distinction that we draw between mandatory and permissive terms of bargaining fits the statutory purpose. By once bargaining and agreeing on a permissive subject, the parties, naturally, do not make the subject a mandatory topic of future bargaining. When a proposed modification is to a permissive term, therefore, the purpose of facilitating accord on the proposal is not at all in point, since the parties are not

required under the statute to bargain with respect to it. The irrelevance of the purpose is demonstrated by the irrelevance of the procedures themselves of § 8 (d). Paragraph (2), for example, requires an offer "to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications." But such an offer is meaningless if a party is statutorily free to refuse to negotiate on the proposed change to the permissive term. The notification to mediation and conciliation services referred to in paragraph (3) would be equally meaningless, if required at all.[23] We think it would be no less beside the point to read paragraph (4) of § 8 (d) as requiring continued adherence to permissive as well as mandatory terms. The remedy for a unilateral mid-term modification to a permissive term lies in an action for breach of contract, see n. 20, *supra,* not in an unfair-labor-practice proceeding.[24]

As a unilateral mid-term modification of a permissive term such as retirees' benefits does not, therefore, violate § 8 (d), the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE DOUGLAS dissents.

---

[23] The notification required by paragraph (3) is "of the existence of a dispute." Section 2 (9) of the Act defines "labor dispute" to include "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment . . . ." 49 Stat. 450, as amended, 29 U. S. C. § 152 (9). Since controversies over permissive terms are excluded from the definition, a paragraph (3) notice might not be required in the case of a proposed modification to such a term even if § 8 (d) applied.

[24] It does not appear whether the collective-bargaining agreement involved in this cause provided for arbitration that would have been applicable to this dispute. We express no opinion, therefore, on the relevance of such a provision to the question before us.