# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 03-3767 & 03-3769

LID ELECTRIC, INC.,

*Plaintiff-Appellee,*

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, LOCAL 134, and ELECTRICAL JOINT
ARBITRATION BOARD,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 1390—**Ronald A. Guzmán**, *Judge.*

_____

ARGUED FEBRUARY 25, 2004—DECIDED MARCH 29, 2004

_____

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* The Electrical Contractors'
Association of Chicago bargains with Local 134 of the
Electrical Workers Union on behalf of its members, one of
which is Lid Electric. When appointing the Association as
its agent for collective bargaining, Lid elected to be bound
by the agreement then in effect between the Association
and the Union, as well as any amendments to or extensions

of that agreement. (The "Principal Agreement" or "Inside Agreement" is the main collective bargaining agreement. There are some additional pacts that we need not describe, so we refer simply to the "Agreement.") Lid's assent remains in force to this day, but it has refused to implement one rule that the Association and the Union promulgated: that a drug-testing program adopted in 2001 be applied to *all* employees of each participating firm. When Lid declined to test any employees other than the electricians represented by the Union, a grievance was filed and led to an order by the Electrical Joint Arbitration Board (the EJAB) that the Union would not refer any members to Lid for employment until Lid complied. Lid then commenced this proceeding for judicial review of the award. The district judge held that the award is invalid.

Both the Union and the EJAB have appealed. Why the arbitrators should be a defendant, Lid has never explained. Nor do we know why Lid omitted the Association as a party. If anyone has violated Lid's rights, it is the Association—which, by Lid's lights, is a faithless agent. Yet the EJAB has not complained about its status as a litigant, and neither the Union nor the EJAB has protested the Association's absence. As a practical matter, this appeal will determine everyone's rights (the Union, Association, and EJAB are contractual partners), so there is no reason to insist that the cast of characters be altered. Moreover, the controversy remains live despite the expiration of the Agreement that was in force when the EJAB issued its award. See *Cox Corp. v. NLRB*, 593 F.2d 261 (6th Cir. 1979). That Agreement ran from 1999 through 2003 but has been succeeded by one that is identical in all respects material to this dispute. The parties agreed that the renewal process in 2003 would not affect their legal entitlements. Thus, if the district judge's decision should be reversed, referrals would again be suspended until Lid applied the drug-testing program to all of its employees.

Lid's grant of authority to the Association provides:

> the undersigned firm does hereby authorize Electrical Contractors' Association of City of Chicago, Inc., NECA as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved Inside labor agreement between the Electrical Contrs. Assoc., NECA, City of Chicago and Local Union 134, IBEW. In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the 27 day of September, 1996. It shall remain in effect until terminated by the undersigned employer giving written notice to the Electrical Contrs. Assoc., NECA, City of Chicago and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

This language authorizes the Association to adopt, on Lid's behalf, any provision "pertaining to" the electricians' wages, working conditions, and other matters normally covered by a collective bargaining agreement. Lid must implement "all" provisions of the agreements, not just those it approves. And we must take it that the Association and Union did adopt the drug-testing program as a protocol to the 1999 Agreement. The 1999 Agreement specifies a program to be negotiated later. The record is not clear just how these negotiations were completed; it may well be (as Lid contends) that the negotiators were the same eight persons who make up the EJAB (four from management, four from labor). Negotiating details do not matter, for two reasons: first, the Agreement itself authorizes the EJAB to amend as well as to interpret the document; second, both the Associa-

tion and the Union have embraced the drug-testing proto-
col, and ratification puts it into force no matter how the text
came into being.

The Union was willing to have the electricians tested but
not to be singled out. So it insisted on a form of most-
favored-nations clause: the electricians would submit to
drug testing only if the employers tested their other work-
ers too. The Association assented; and Lid, as a member, is
bound if the program became one "of the provisions con-
tained in said current and subsequent approved labor
agreements." Lid insists that the program is not a "pro-
vision" of the Agreement, but the EJAB thought otherwise,
and in doing so did not exceed the wide latitude allowed to
a labor arbitrator. See *Major League Baseball Players Ass'n
v. Garvey*, 532 U.S. 504, 509-10 (2001). Collective bargain-
ing agreements include their amendments, protocols, and
other supplemental documents; terms can be among their
"provisions" without appearing on the sheet of paper that
contains the parties' signatures. Many an agreement
incorporates other documents by reference; this is the norm,
for example, with respect to retirement and health-care
plans, which may be elaborately detailed but are rarely set
out verbatim in the collective bargaining agreements. Just
as a labor agreement may incorporate a pension plan, so
may it incorporate a drug-testing plan. The 1999 Agreement
said that this was the idea; by the time the 2003 Agreement
(which governs today) was ratified, the drug-testing plan
had been in place for two years. It is no less among the
Agreement's "provisions" than is the pension plan—or so an
arbitrator could find without just making things up. Even
an oral understanding may be counted among the compo-
nents of a collective bargaining agreement. See, e.g.,
*Transportation-Communication Employees v. Union Pacific
R.R.*, 385 U.S. 157, 160-61 (1966); *United Steelworkers v.
Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578-81 (1960);
*Matuszak v. Torrington Co.*, 927 F.2d 320, 324 (7th Cir.

1991). But this plan was written and is as much part of this Agreement as a codicil is part of a will.

Lid believes, however—and the district court held—that even if the drug-testing plan is part of the Agreement, the Union and Association have no authority to make rules binding on other employees. Unions represent workers in units certified by the National Labor Relations Board; they do not speak for workers in gross. The Union cannot waive any rights of persons outside the bargaining unit or negotiate contracts on their behalf. True enough, but irrelevant. The Agreement (with the drug-testing rider) does not purport to establish legal obligations for anyone other than the Association's members and the electricians the Union represents. It does not have to. The Agreement binds Lid itself; no more is necessary. The Union and Association jointly created, not an undertaking by non-unit employees to *submit* to tests, but an obligation that Lid *administer* drug tests to all of its employees. The Association acted as Lid's agent when agreeing that Lid (like other members) would conduct these tests. None of Lid's non-unit employees is obliged to submit; but Lid must attempt to secure their cooperation using the tools of persuasion at its disposal. For employees without term contracts (that is, employees at will), Lid can credibly threaten discharge. It is Lid's own disregard of its promise to implement the Agreement in full that the EJAB penalized by the termination of referral services. Lid could have adopted a drug-testing regimen for its other workers unilaterally; the employees would have had no legal complaint (with one exception discussed below). Choices that Lid could make on its own it also could delegate to the Association to make as its agent in the course of collective bargaining (and in exchange for something employers value). Transferring bargaining chips to an agent for many employers may strengthen the hand of all.

Labor law permits collective bargaining agreements to reach beyond the certified unit of workers. How employers

treat non-unit workers is a permissive subject of bargaining. Neither union nor employer is required to negotiate about permissive subjects (that's what it means to call them "permissive" rather than "mandatory"), see *NLRB v. Borg-Warner Corp.*, 356 U.S. 342 (1958), but they can do so when they find it mutually beneficial. Employers may promise to provide breaks, clean lunchrooms, and comfortable working conditions for all employees; likewise they may promise to treat bargaining-unit employees no worse than they treat others even though such promises (like the one in the drug-testing plan) affect those others. These points are well established with respect to pension and welfare plans. Retired employees are no longer in a bargaining unit, but union and employer may bargain (if they choose) over benefits that the retirees will receive. See *Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971). If the Union and the Association can set the health-care benefits available to retirees, and they may, they also may establish drug-testing plans and reach other agreements that affect how employers deal with persons outside the bargaining unit. See also *Florida Power & Light Co. v. Electrical Workers*, 417 U.S. 790, 812 n.22 (1974) (agreement may cover terms and working conditions of supervisors, even though they cannot be included in the bargaining unit); *Pall Corp. v. NLRB*, 275 F.3d 116, 123 (D.C. Cir. 2002).

What the Association cannot do on Lid's behalf, however, is commit Lid to violate rules of positive law. Nor may an arbitration award require unlawful acts. See *George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577 (7th Cir. 2001). That the Agreement may require Lid to discharge uncooperative non-unit employees does not present any risk of illegality; even an obligation to break a contractual promise does not meet that standard. See *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757 (1983) (that an arbitrator's award requires employer to break a different contract is not

a reason to refuse enforcement). But more than a contract may stand in the way of Lid's full implementation of the Agreement. Local 150 of the International Union of Operating Engineers represents some of Lid's other employees, who are covered by a collective bargaining agreement running through May 31, 2007. Federal law requires Lid to respect that agreement; it is not just a matter of paying damages for breach. If that agreement (which is not in the record) has its own drug-testing rules, Lid must follow them rather than anything in the agreement between the Association and the electricians' union. If that agreement does *not* provide for drug testing, then Lid cannot institute testing unilaterally—for the operating engineers' terms and working conditions are a mandatory subject of collective bargaining. Many agreements forbid mid-term changes without mutual assent, so the topic might not reach the table until 2007. No matter when negotiations begin, however, bargaining—and either an agreement or an impasse—must precede any change in terms and conditions under which the operating engineers are employed. To the extent that the EJAB's order requires Lid to implement drug testing for employees represented by Local 150, without first bargaining collectively with that union, it commands a violation of federal law and must be set aside.

The judgment of the district court is vacated, and the case is remanded with instructions to enter an order enforcing the arbitral award, except to the extent that it requires Lid to violate the bargaining rights of workers represented by other unions.

**A true Copy:**

      **Teste:**

               _____

               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*