UNITED TEXTILE WORKERS OF AMERICA, A.F.L. Local 1802 and United Textile Workers of America, A.F.L., Plaintiffs,

GOODALL–SANFORD, Inc., Defendant.

Civ. A. No. 4–40.

United States District Court, D. Maine, S. D.

April 1, 1955.

**860**

———◆———

Sidney W. Wernick, Portland, Maine, for plaintiff.

William B. Mahoney, Portland, Maine, for defendant.

CLIFFORD, District Judge.

This matter is presently before this Court upon a prayer by the plaintiffs for a preliminary injunction, pending a final determination of the issues raised by their complaint. The plaintiffs seek to enjoin the defendant corporation from terminating the employment of any of its employees covered by the collective bargaining agreement now existing between them, and from removing the names of said employees from the payroll records of the defendant on the ground that the departments in which said employees previously worked have been completely shut down and will not reopen.

The plaintiffs have initiated this proceeding under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185. Merely for the purpose of clarity, it may be noted that the complaint concerns two categories of employees. In the first group are those employees whose employment has already been terminated by the defendant corporation. There are approximately 1,400 employees in this category. With regard to these employees the plaintiffs seek specific performance of their collective bargaining agreement which provides for arbitration. The question which they desire to submit to arbitration relates to the right of the defendant corporation to terminate the employment of its employees for a reason other than those specified in their collective bargaining agreement. In the alternative, the plaintiffs pray that this Court award such damages in the premises as it deems meet and proper.

The second category of employees is comprised of some 1,800 persons who are presently on a lay-off status and are still on the payroll records of the defendant corporation. With regard to these employees the plaintiffs pray that the defendant corporation be enjoined, during the pendency of this action, and thereafter during the life of the collective bargaining agreement from terminating their employment and from removing their names from the payroll records for the reasons hereinbefore assigned by the defendant corporation. Therefore, it is with respect to the rights of these employees that this Court is principally concerned in determining whether a preliminary injunction should issue in this action.

 The defendant asserts that this Court lacks jurisdiction to consider this case.

Considering Milk and Ice Cream Drivers and Dairy Employees Union, Local No. 98 v. Gillespie Milk Products Corp., 6 Cir., 203 F.2d 650; Textile Workers Union v. American Thread Co., D.C. Mass., 113 F.Supp. 137; Local 207, etc., v. Landers, Frary & Clark, D.C.Conn., 119 F.Supp. 877; Insurance Agents' International Union v. Prudential Ins. Co., D.C.Pa., 122 F.Supp. 869; Evening Star Newspaper Co. v. Columbia Typographical Union, D.C.D.C., 124 F.Supp. 322, this Court is of the opinion that it has jurisdiction to afford equitable relief under Section 301 of the so-called Taft-Hartley Act. See also: Industrial Trades Union v. Woonsocket Dyeing Co., D.C.R.I., 122 F.Supp. 872. Contra: International Longshoremen's, etc., v. Libby, McNeill & Libby, D.C.Haw., 114 F.Supp. 249. Accordingly and pursuant to a request from Local 1802, this Court on March 15, 1955, granted a ten-day temporary restraining order enjoining the defendant corporation from terminating the employment of those 1,800 employees who were then and still are on lay-off status.

On March 21, 1955, a conference was held in the chambers of this Court with regard to certain motions filed by each of the parties. At that time, this Court, upon motion by the plaintiffs, extended the temporary restraining order for an additional ten days, to expire on April 4,

1955, unless otherwise ordered. Two days later, on March 23, 1955, a hearing with respect to the issuance of a preliminary injunction was held.

### Findings of Fact

The facts, as found by this Court from the evidence introduced at said hearing, are as follows:

The plaintiff, United Textile Workers of America, A.F.L., Local Union 1802, is an unincorporated association, and a labor organization and trade union engaged in representing employees for the purposes of collective bargaining. The plaintiff and its duly authorized officers, or agents, has been and now is representing or acting for employee members of the plaintiff in the State and District of Maine, and in particular, is the sole and exclusive statutory collective bargaining representative of, and agency for, all of the production and maintenance employees of the defendant corporation, including working foremen, employed at Sanford and Springvale, Maine.

The second party plaintiff in this action is the United Textile Workers of America, A.F.L.

The defendant, Goodall-Sanford, Inc., is a corporation organized and existing under and by virtue of the laws of the State of Maine, with its principal office and place of business at Sanford, Maine. It is engaged in the business of manufacturing and selling textile products which move in interstate commerce, and its conduct of said business is such that it is in interstate commerce and affects interstate commerce within the meaning of federal laws and, in particular, the Labor Management Relations Act, 1947, 29 U. S.C.A. § 185.

Approximately 3,000 persons were employed by the defendant corporation as of January 1, 1954, and some 3,200 employees qualified for vacation pay in June, 1954. However, some time prior to December 29, 1954, the defendant corporation ceased production except for "running out" those products which were in process at that time. By December 29th Mills A and C and the print works had shut down completely; Mill B by March 15, 1955. All of the equipment in each of these departments has either been removed or sold to third parties.

With the exception of a very few production employees, the only persons presently employed are the maintenance and powerhouse men who are working on a "share the work" basis. As for the future, there have been recent discussions between the defendant corporation and the purchaser of its properties with regard to the defendant corporation obtaining a lease of Mills B and G for the next three to six months for the purpose of completing their liquidation.

The plaintiffs and the defendant corporation had entered into and executed a collective bargaining agreement on October 1, 1951. The said collective bargaining agreement was renewed by the parties thereto on July 29, 1953, to continue in full force and effect until July 15, 1955, unless either party were to give a notice to modify it sixty days prior to July 15, 1954. On May 12, 1954, the defendant corporation gave notice of modification to the plaintiffs, as a result of which a supplemental agreement was entered into and executed by the plaintiffs and defendant, effective June 21, 1954. Because of the execution of said supplemental agreement, the defendant corporation withdrew the aforesaid notice of May 12, 1954, such that the agreement dated October 1, 1951, as renewed July 29, 1953, and as supplemented by the supplemental agreement effective June 21, 1954, constitutes the entire collective bargaining agreement between the plaintiffs and the defendant corporation in full force and effect until July 15, 1955.

In said contract the following relevant provisions appear:

A. "Article VI.

"A * * * 3. Continuous Service: Employee's service in an occupation will be continuous except as broken under the provisions of Section E (Transfers) of this Article VI or by termination of his employ-

ment under the provisions of Article VII."

B. "Article VII.

"A. Reasons for Termination: An employee's continuous service and his employment with the Company shall be terminated by:

"1. Voluntary quit.

"2. Discharge for cause.

"3. Absence from work for a period of (18) months or more for any reason other than to fill a Union position to which the employee was elected or appointed or where an entire operation has been discontinued."

C. "Article VIII.

"B. Arbitration: If a satisfactory adjustment is not reached within (10) working days after initiation of conferences in Step 4, any dispute which relates solely to the meaning and application of this Agreement or any individual grievance may be referred to arbitration by written notice by either party to the other. If the written notice is not given within five (5) working days after the completion of Step 4, the grievance shall be considered as settled, and any right to arbitrate waived. Arbitration shall be in accordance with the following procedure:

"1. The arbitrator shall be a single arbitrator selected from a panel of three agreed to by the Union and the Company. If the Company and the Union are unable to agree on one of the three, the arbitrator who will first be available for a hearing shall be selected.

"2. The Arbitrator shall have no power to add to or subtract from the terms of this Agreement.

"3. The Arbitrator's decision shall be in writing and shall be final and binding on the Company and the Union.

"4. Awards or settlements of grievances shall be effective as of the date on which the written grievance was first presented, except as otherwise provided by this Agreement, or by mutual consent."

D. "Purpose of Agreement. It is the intent and purpose of the parties hereto to promote and improve the industrial and economic relations between the Company, its employees, and the Union, and to establish and maintain a basic understanding in relation to rates of pay, hours of work, and other conditions of employment toward full cooperation, good quality of production, and successful operation of the Company's plants.

E. "Article XVI—Waiver. The parties acknowledge that during the negotiations which resulted in this agreement each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this agreement. Therefore, the Company and the Union, for the life of this agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered in this agreement, or with respect to any subject or matter not specifically referred to or covered in this agreement, even though such subjects or matter may not have been within the knowledge or contemplation of either or both parties at the time that they negotiated or signed this agreement."

On the 29th day of December 1954, approximately 1136 production and maintenance employees, including working foremen, of the defendant corporation, employed by the defendant at Sanford and Springvale, Maine, all of whom were on lay-off status prior to and as of said

date, were notified by the defendant that their employment with Goodall-Sanford, Inc., was terminated as of December 29, 1954, and that effective said date their names were being removed from the payroll records of the company. The ground of said termination was stated to be that

"owing to the liquidation proceedings in Mills A, B, C and Print Works * * * and the subsequent sale of the mills, the department in which (the employees) previously worked had been completely shut down and will not reopen."

On the 30th day of December 1954, by letter signed by Herman Ackroyd, president of United Textile Workers of America, A.F.L., Local 1802, a protest was filed with the defendant charging that the purported termination by the defendant of approximately 1136 production and maintenance employees constituted a breach of the collective bargaining agreement between the plaintiffs and the defendant corporation. The said protest stated that it was to be accepted as a protest covering all workers affected, and requested that a meeting be held at the earliest convenience to discuss the matter.

Accordingly a conference was arranged and on the 13th of January 1955, a meeting was held between the Conference Committee of Local 1802 and representatives of the defendant corporation. Subsequent to said meeting, the defendant corporation notified the approximately 1136 employees whom the company had purportedly terminated in their employment as of December 29, 1954, that the termination date of December 29, 1954, was rescinded and that a new termination date, January 29, 1955, was fixed.

By letter dated January 31, 1955, duly signed by Herman Ackroyd in his capacity as president of Local 1802, he again protested that the action of the defendant in purporting to terminate the employment of approximately 1136 of its maintenance and production employees constituted a violation by the defendant of their collective bargaining agreement. He therefore requested a meeting of the parties to decide upon the procedure to be followed in an attempt to resolve the dispute. Such a meeting was held on February 17, 1955. At this meeting, Mr. Craig, the Director of Industrial Relations at Goodall-Sanford, Inc., informed Mr. Ackroyd that the 1,800 employees then on lay-off status would be terminated within the near future. The defendant corporation also informed the plaintiffs that said termination would be purportedly effected for the same reason and on the same ground as the purported termination of the other approximately 1,100 employees on January 29, 1955.

Actually, on February 18, 1955, approximately 263 additional production and maintenance employees of the defendant corporation, employed by the defendant either at Sanford or Springvale, Maine, or both, were notified that their employment with Goodall-Sanford, Inc., was terminated, effective February 18, 1955, and that as of said date their names were being removed from the payroll records of the company. The ground of this purported termination was specified to be the same as that previously given regarding the purported January 29, 1954, termination.

By letter dated February 23, 1955, Mr. Ackroyd, in his official capacity notified the defendant that the union was requesting arbitration of the entire dispute in accordance with the provisions of Section B of Article VIII of the collective bargaining agreement. In said letter, Mr. Ackroyd submitted the names of three persons who had previously constituted a panel agreed to by the plaintiffs and the defendant, of whom one was to be selected. The plaintiffs specified in said letter that any one of the three persons would be acceptable to the plaintiffs as an arbitrator. Except on one or two occasions during the last five years, within which period some forty or fifty matters were submitted to arbitration, these three persons were used exclusively by the parties as arbitrators.

On March 2, 1955, another meeting was had between the parties, again for the purpose of attempting to resolve their differences. It was at this meeting that the defendant corporation denied the request of the plaintiffs to arbitrate the conflict existing between them, and promised to send the plaintiffs a letter to that effect.

On the 8th day of March 1955, the defendant corporation notified the plaintiffs in writing that it was refusing plaintiffs' request for arbitration and that it would not arbitrate the dispute regarding the termination of employment of its employees since the defendant corporation did not consider the matter arbitrable under the contract.

While in the employment of the defendant corporation, either on an active or lay-off status, the employees are afforded certain so-called fringe benefits—life, health, accident, and hospitalization insurance, pensions and vacation pay. A brief description of these benefits and the consequence with regard thereto as a result of a termination of employment is as follows:

a. *Life Insurance.* Policies of life insurance are carried in the amount of $500, together with provisions of double indemnity on the life of each employee, the company paying for the premium on a group basis. An employee on lay-off—rather than terminated in his employment—is afforded the benefit that the defendant corporation will continue the payment of life insurance premiums, at the group rate, for the calendar month in which the lay-off began and one calendar month thereafter. At the expiration of such period the said employee, on lay-off, could continue his policy in force by himself paying the life insurance premium at the same (group) rate which was being paid by the company. Each employee whose employment has been terminated, however, in order to keep his life insurance in force, is obliged within thirty-one days after the date of termination to pay

"* * * the premium applicable to the class of risks to which he belongs, and to the form and amount of the policy at his then attained age * * *."

As to those employees already terminated by the defendant corporation, the thirty-one day period for the employees to convert their policies has expired and many of said employees, being unable to afford the substantially increased premiums, have been unable to effect a conversion.

b. *Health and Accident Insurance.* By virtue of this insurance, the premiums for which the defendant corporation paid on a group basis, the employees on active status are entitled to a weekly benefit of $22.50 per week, lasting for a maximum of thirteen weeks for any one disability (beginning on the eighth day in the case of illness, and on the first day in the case of accident), and are also entitled to medical and surgical and maternity benefits. A person on lay-off has automatic coverage for thirty-one days after the commencement of the lay-off status. Coverage ceases immediately, however, upon termination of employment.

c. *Blue Cross Hospitalization Insurance.* In the event of lay-off, the defendant corporation is required to continue to pay premiums at a group rate for the benefit of the employee until the fifteenth day of the calendar month next following the date of lay-off. Should the lay-off continue thereafter, the employee himself has the privilege of paying the premium, at the group rate, to keep his policy alive. In the event of termination of employment, the employee is obliged immediately to pay for himself at a higher premium rate without the benefit of group savings.

d. *Pension Benefits.* Article X–C of the collective bargaining agreement between the plaintiffs and the defendant corporation provides as follows:

In accordance with an agreement between the parties dated May 25, 1951, the Company on approval by the Wage Stabilization Board will modify its present retirement benefits to the following.

The Company will pay retirement benefits to employees who, having attained the age of 65, retire from employment with the Company and have at the time of their retirement completed 20 years or more of continuous service with the Company.

(1) Retirement benefits will be in the amount of $20 a month for such employees who have completed 20 years of continuous service but not more than 24 years of continuous service.

(2) Retirement benefits will be in the amount of $25 a month for those that have completed 25 or more years of continuous service.

c. *Vacation Pay.* In this respect the collective bargaining agreement provides as follows:

"*Article V.*

"*B. Eligibility Requirements:* During the term of this agreement an employee on the payroll of the Company on June 1st of the vacation year and who has worked at least 900 hours in the twelve-month period from June 1 of the preceding year to May 31 of the vacation year (both dates included) shall be eligible for vacation with pay if he qualifies under the following requirements:

(1) An employee with one (1) year, but less than (3) three years of continuous service with the Company shall receive (1) week of vacation with forty (40) hours' pay.

(2) An employee with three (3) years, but less than five (5) years of continuous service with the Company shall receive one (1) week of vacation with sixty (60) hours' pay.

(3) An employee with five (5) years or more of continuous service with the Company shall receive two (2) weeks of vacation with eighty (80) hours' pay.

Employees who have returned with continuous seniority from the armed services of the U. S. during the twelve-month period from June 1 of the preceding year to May 31 of the vacation year, are not required to have worked 900 hours during that period in order to qualify for vacation with pay.

"*C. Vacation Pay:* Vacation pay will be computed by multiplying the number of hours to which the employee is entitled by the employee's average hourly earnings. Average hourly earnings for day workers will be equal to the regular rate which the employee received during the payroll week which includes the first of June immediately preceding the vacation period. If the employee did not work during that week the rate which the employee received during the week next preceding June 1 in which the employee worked will be used. The average hourly earnings for a piece or incentive worker shall be the average straight-time hourly earnings exclusive of overtime for a four (4) week period in the month of May immediately preceding the vacation period. If the employee did not work during the month of May his average straight-time hourly earnings during the next month preceding May in which the employee worked will be used.

### Conclusions of Law

■ Under all of the facts and circumstances of this case, and considering the relative importance of the rights asserted and the Act sought to be enjoined, the irreparable damage to which these employees would be subjected from a denial of preliminary relief with reference to life, health, and accident, and hospitalization insurance, pension and vacation pay benefits; the balancing of damage and convenience generally; and, that the plaintiffs have raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation, and thus for more deliberate investigation, this Court is of the opinion that a preliminary injunction should issue as prayed for by the plaintiffs.

It is, therefore, ordered, adjudged and decreed that the prayer for preliminary injunction during the pendency of this action be and hereby is granted.

It is further decreed that the defendant corporation, its officers, agents, servants, employees, and attorneys be en-

joined during the pendency of this action or until further order of this Court, from terminating the employment of those employees now on a lay-off status, who are covered by the collective bargaining agreement between the plaintiffs and defendant corporation, and from removing their names from the payroll records of the defendant corporation on the ground that the department in which said employees previously worked have been completely shut down and will not reopen, or on any ground other than those specified in their collective bargaining agreement.