**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**May 18, 2005**

**Charles R. Fulbruge III**
Clerk

REVISED JUNE 1, 2005

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 04-10418

———————————

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS
LOCAL LODGE 2121 AFL-CIO,

                              Plaintiff-Appellee,

        versus

GOODRICH CORPORATION, formerly
known as BF Goodrich Company,

                              Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Northern District of Texas

———————————

Before GARWOOD, JONES, and PRADO, Circuit Judges.

GARWOOD, Circuit Judge:

        Defendant-appellant Goodrich Corporation (Goodrich) appeals
the district court's grant of partial summary judgment to
plaintiff-appellee International Association of Machinists and
Aerospace Workers Local Lodge 2121 AFL-CIO (Union) on count two of
the latter's three-count complaint in which count the Union sought

an order compelling arbitration of the parties' dispute over retiree benefits in their collective bargaining agreement (CBA). We hold that we lack jurisdiction to review the district court's order compelling Goodrich to arbitrate. We also conclude that we do not have appellate jurisdiction on the theory that the district court's order was void for want of jurisdiction, because we further conclude that the Union has standing under Section 301(b) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(b), to bring suit on behalf of the fifty-two retirees whose authorizations for the Union to represent them in all the matters at issue in the suit were filed in district court below.

## Facts and Proceedings Below

Goodrich merged with Coltec Industries in 1998 and thereby acquired its manufacturing facility in Euless, Texas. The Union represented bargaining-unit aerospace employees at this facility, and Goodrich assumed Coltec's responsibilities under the 1996 CBA. Section 8.37 of the CBA provided that early retirees, meaning those who elected to retire before turning sixty-five, were entitled to choose between healthcare coverage under Coltec's own company plan or under an HMO. If the retiree opted for the Coltec plan, the company would cover the premiums. If the retiree opted for the HMO, the company would contribute an amount equal to the premium for the company plan and the retiree would have to make up the difference. If, on the other hand, the

2

HMO cost less than the company plan, the company would pay the HMO premium and credit the difference between the HMO and the company plan to the cost of coverage for the retiree's spouse.

On April 14, 2000, Goodrich notified the Union that it intended to close the Euless facility. Pursuant to 29 U.S.C. § 158(d), the parties then engaged in "effects bargaining," and, on August 1, 2000, signed the Plant Closure Agreement (PCA). Paragraph sixteen of the PCA stated that Goodrich would have the right to modify the healthcare coverage of early retirees as part of "reasonable cost containment measures" but only to the extent that this would not result in any "material change in the level of benefits." The PCA also contained a comprehensive arbitration clause at paragraph seventeen in which the parties agreed that "[a]ny future disputes regarding the interpretation, application or performance of [the PCA] or the CBA shall be resolved by [a designated arbitrator]." Goodrich closed the Euless facility on November 15, 2000.

In November of 2002, Goodrich informed the Union that, effective February 1, 2003, it intended to offer a different HMO option. Under this new HMO option, the cost of HMO coverage would for the first time exceed the cost of coverage under the original Coltec plan. This meant that retirees with HMO coverage would for the first time have to pay out-of-pocket for their healthcare coverage. The Union contended that this change

3

constituted a material alteration in the level of benefits guaranteed by the PCA. Goodrich not only disagreed but also refused to submit the controversy to arbitration.

On December 20, 2002, the Union filed a three-count complaint under Section 301(b) of the LMRA, 29 U.S.C. § 185(b), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, seeking in count one, pursuant to Section 301(b), specific performance of the healthcare benefits provision of the PCA; in count two, in the alternative and also under Section 301(b), enforcement of the PCA's arbitration clause; and in count three, in addition to the relief sought under counts one or two, a declaration of the parties' rights and duties under the PCA. Following discovery, the Union filed its "Motion For Partial Summary Judgment," seeking "summary judgment on Count II of its complaint." In support of its motion, the Union filed, *inter alia*, fifty-two "retiree representation authorization" forms, each one of which was signed by a retiree who, by the terms of the authorization, affirmed that the Union has, and has always had, the authority to represent him in any claim arising under the CBA and PCA. Soon thereafter, Goodrich filed a motion to dismiss counts one and two, arguing that the Union lacks standing under Section 301 to represent the retirees because Section 301(b) only authorizes a labor organization to represent active employees. Goodrich did *not* move to dismiss count three.

4

On March 8, 2004, the district court granted the Union's motion for partial summary judgment and directed the parties to arbitrate their dispute. However, rather than enter judgment for the Union and dismiss counts one and/or three, the district court instead directed the clerk to "administratively" close the case and ordered "[i]f the claims in this suit are not resolved in arbitration, either party may move to reopen the cause, but such motion must be filed no later than 30 days after the arbitration process is completed." The district court's ruling is contained in a 15 page document entitled "Order Granting Plaintiff's Motion For Partial Summary Judgment, Compelling Arbitration, And Administratively Closing Case." The district court also determined as part of its summary judgment analysis that the Union has standing to bring a Section 301 suit on behalf of retirees. Having determined that the Union has standing, the district court in a separate order on the same day, "ordered that" Goodrich's motion to dismiss counts one and two on this ground "is rendered MOOT."[1]

Goodrich timely filed proper notice of appeal.

I.

Though not raised by either party, the unusual procedural posture of this case has led us to question our jurisdiction *sua*

---

[1] There is no document entitled "Judgment" or "Final Judgment." There is no award of costs in either of the March 8, 2004 orders, or elsewhere.

5

*sponte.* *Mosley v. Cozby*, 813 F.2d 659, 660 (5th Cir. 1987) ("This Court must examine the basis of its jurisdiction, on its own motion, if necessary."). The issue before us is whether we can exercise appellate jurisdiction over an order granting partial summary judgment in which the district court: (1) directs the parties, pursuant to Section 301(b), to arbitrate their dispute; (2) administratively closes the case without resolving count three of the complaint, brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and (3) expressly retains jurisdiction to hear any claims not resolved in arbitration.[2] In

---

[2] The supplemental letter briefs filed at our request address the possibility that we could simplify this case by holding that collective bargaining agreements are subject to the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.* This is now a plausible approach because in *Circuit City Stores, Inc. v. Adams*, the Supreme Court held that the FAA applies to all contracts of employment, except those in the interstate transportation industries. 532 U.S. 105, 109 (2001). At first blush, this holding implicitly includes collective bargaining agreements. Nevertheless, most courts, both before and after *Circuit City*, adhere to the traditional view that suits arising under Section 301 and concerning collective bargaining agreements are outside the scope of the FAA. *See, e.g., Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1097 (8th Cir. 2004) (stating that nothing in *Circuit City* undermines the Supreme Court's holding in *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 451-452 (1957), that "§ 301 provides an independent basis for federal jurisdiction to enforce labor arbitration[.]"); *Coca-Cola Bottling Co. of New York, Inc. v. Soft Drink and Brewery Workers Union Local 812, Int'l Bhd. of Teamsters*, 242 F.3d 52, 53 (2d Cir. 2001) ("We hold that in cases brought under Section 301...the FAA does not apply."); *Int'l Chem. Workers Union v. Columbian Chemicals Co.*, 331 F.3d 491, 494 (5th Cir. 2003) (citing, *inter alia*, *Coca-Coca Bottling Co.* and stating that the "district court appropriately relied only on [Section 301, as opposed to the FAA] when it confirmed the arbitration award because this case involves arbitration under a

6

our view, there are two possible bases for jurisdiction.  The partial summary judgment order was either a final order under 28 U.S.C. § 1291 or it was an appealable interlocutory injunction under 28 U.S.C. § 1292(a)(1).[3]  We will address each in turn.

### a.    Final Order

---

CBA."); *but see Briggs & Stratton Corp. v. Local 232, Int'l Union, Allied Indus. Workers of America*, AFL-CIO, 36 F.3d 712, 715 (7th Cir. 1994) ("As it happens, our circuit is among the minority that has limited § 1 [of the FAA] to the transportation industries and therefore applies the Arbitration Act to most collective bargaining agreements.") (citing *Pietro Scalzitti Co. v. Operating Engineers*, 351 F.2d 576, 579-580 (7th Cir. 1965)).

We find it unnecessary to revisit our dictum in *Columbian Chemicals*, 331 F.3d at 494, that only Section 301, and not the FAA, applies to collective bargaining agreements because, regardless of which statute applies, our appellate jurisdiction depends in the first instance on whether the district court order was a "final order."  *Greentree Financial Corp. - Alabama v. Randolph*, 121 S. Ct. 513, 519 (2000) (holding that subsection 16(a)(3) of the FAA, 9 U.S.C. § 16(a)(3), which states that an appeal may be taken from a "final decision with respect to an arbitration that is subject to this title," uses the term "final decision" in its well-established sense under 28 U.S.C. § 1291) (citing *Evans v. United States*, 504 U.S. 255 (1992)).  In light of our conclusion that the district court's order is not final under 28 U.S.C. § 1291 (and, as a result, appellate jurisdiction does not exist), there is no reason to reach the question of whether the FAA or traditional section 301 jurisprudence now controls controversies arising under a collective bargaining agreement.

[3] There is no appellate jurisdiction under the collateral order doctrine over an order staying a case pending arbitration. *Jolley v. Paine Wbber Jackson & Curtis, Inc.*, 864 F.2d 402, 404 (5th Cir. 1989) (citations omitted) (stating that "an order granting a stay pending arbitration is not effectively unreviewable on appeal from a final judgment."); *Mire v. Full Spectrum Lending, Inc.*, 389 F.3d 163, 167 (5th Cir. 2004) (holding that an administrative closure is the functional equivalent of a stay).

In response to our request for additional briefing on appellate jurisdiction, Goodrich relies primarily on *Goodall-Sanford, Inc. v. United Textile Workers of America*, 353 U.S. 550, 77 S. Ct. 920 (1957), for the proposition that a district court order compelling arbitration under Section 301 is a final order for the purposes of appeal.  Goodrich directs our attention in particular to *Goodall-Sanford*'s holding:

> "The right enforced here is one arising under § 301(a) of the Labor Management Relations Act of 1947. Arbitration is not merely a step in judicial enforcement of a claim nor auxiliary to a main proceeding, but the full relief sought.  A decree under § 301(a) ordering enforcement of an arbitration provision in a collective bargaining agreement is, therefore, a 'final decision' within the meaning of 28 U.S.C. § 1291."

353 U.S. at 551-552, 77 S. Ct. at 921.  In Goodrich's view, *Goodall-Sanford* in effect established a bright-line rule under which an order to arbitrate is always a final order for the purposes of 28 U.S.C. § 1291 as long as the order to arbitrate is issued pursuant to Section 301 of the LMRA.  Because the district court's order in the instant case was indeed predicated on Section 301, Goodrich argues that the order is accordingly a final, and therefore appealable, order.

We disagree.  Though we have a copy of neither the complaint nor the district court's final judgment in *Goodall-Sanford*, it is evident on the face of the published opinions in that case that *Goodall-Sanford* is procedurally distinguishable from the case at

bar.

First, in that case the United Textile Workers brought suit exclusively under Section 301. *United Textile Workers of America v. Goodall-Sanford, Inc.*, 129 F. Supp. 859, 860 (S.D. Maine 1955) ("The plaintiffs have initiated this proceeding under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185."); *accord United Textile Workers of America v. Goodall-Sanford, Inc.*, 131 F. Supp. 767, 767 (S.D. Maine 1955); *Goodall-Sanford, Inc. v. United Textile Workers of America*, 233 F.2d 104, 105 (1st Cir. 1956); 353 U.S. at 551, 77 S. Ct. at 921. In addition, the United Textile Workers sought only one form of relief, either an order to arbitrate or, in the alternative, damages. 129 F. Supp at 860.

Like the United Textile Workers, the Union in the instant case similarly brought two counts under Section 301, pleading respectively for either specific performance of the CBA or, in the alternative, for an order compelling arbitration. Unlike the United Textile Workers, however, the Union here also included a third count brought under the Declaratory Judgment Act. This third count was pleaded as an independent cause of action, not in the alternative to any relief under counts one or two. This is a critical distinction. In reaching its conclusion that the judgment in *Goodall-Sanford* was a final order under 28 U.S.C. § 1291, the Supreme Court emphasized that the order to arbitrate

9

was the "full relief sought" by the United Textile Workers. 353 U.S. at 551, 77 S. Ct. at 921. In the instant case, on the other hand, the Union sought declaratory relief altogether separate from, and in addition to, the order to arbitrate, meaning that the order compelling arbitration only granted the Union part of the relief it sought.

Furthermore, the decree supporting the order to arbitrate in *Goodall-Sanford* was a final order in the sense that it ended the litigation and left the district court with nothing to do but execute the judgment. 233 F.2d at 105 ("Thus it seems that the [district] court did *not* intend to reserve jurisdiction to confirm the arbitrator's decision." (emphasis added)); *accord id.* at 107 ("The decree also provided, as already noted, that the award was to be 'final and binding[.]'"). Given that the district court rendered a final decision on the merits of the United Textile Workers' claims, it is unsurprising that the Supreme Court treated the lower court's decree as a final order under 28 U.S.C. § 1291. The district court in the instant case, however, did not render a "final and binding" judgment on the merits. Instead, the district court only ruled on the two Section 301 claims and declined to address the Declaratory Judgment Act claim.

An additional procedural distinction is that the district court closed the instant case administratively rather than render

a final judgment. We have held that such an administrative closure is the functional equivalent of a stay and a stay will not support appellate jurisdiction under 28 U.S.C. § 1291. *Mire v. Full Spectrum Lending, Inc.*, 389 F.3d 163, 167 (5th Cir. 2004) (holding, in a case decided under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, that an administrative closure is identical to a stay); *Apache Bohai Corp. v. Texaco China, B.V.*, 330 F.3d 307, 309 (5th Cir. 2003) (holding, in an FAA case, that a stay is not equivalent to a dismissal for the purposes of 28 U.S.C. § 1291).

Finally, also unlike *Goodall-Sanford*, the district court in the instant case expressly retained jurisdiction to entertain any claims the arbitration fails to resolve. This reservation of jurisdiction for the purpose of hearing substantive claims also precludes appellate jurisdiction because an order framed this way is not a final judgment. *See, e.g., Mire; Apache Bohai Corp.*

Thus, when the full procedural history of *Goodall-Sanford* is explicated, it becomes apparent that the Supreme Court's decision was based on the unambiguous finality of the underlying district court judgment. Where, however, as in the instant case, none of the salient indicia of finality are present, *Goodall-Sanford* does not control. We conclude, therefore, that the order directing the Union and Goodrich to arbitrate their dispute cannot be considered a final order for the purposes of 28 U.S.C. § 1291

11

because the district court: (1) declined to resolve all of the Union's claims; (2) only closed the case administratively rather than entering a final judgment; and (3) reserved jurisdiction to hear substantive claims not resolved by the arbitration. Accordingly, we lack jurisdiction under 28 U.S.C. § 1291 to entertain Goodrich's appeal.

### b.   Appealable Interlocutory Order

We also do not have jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court order staying the case and ordering arbitration is not an interlocutory injunction. To understand why, it is helpful to review how appellate courts have traditionally analyzed a decision to grant or deny a stay.

Under the former *Enelow-Ettelson* doctrine,[4] appellate jurisdiction over stays under 28 U.S.C. § 1292(a)(1) only arose when a district court granted or denied a stay of a suit at law on the basis of a defense or counterclaim that sounded in equity. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 108 S. Ct. 1133, 1139 (1988). Appellate jurisdiction would not arise when the decision to grant or deny a stay was in a suit at law and the decision was predicated on legal considerations nor when, on the other hand, the suit was in equity and the decision was predicated on equitable considerations. *Id.* In such cases, the

---

[4] So named because of two seminal cases, *Enelow v. New York Life Ins. Co.*, 293 U.S. 379 (1935), and *Ettelson v. Metropolitan Life Ins. Co.*, 317 U.S. 188 (1942).

12

stay was not considered an interlocutory injunction, or denial thereof, but instead simply a decision by a judge or chancellor to manage his own docket.  The historical premise behind the *Enelow-Ettelson* doctrine was the fact that, traditionally, a judge at law and a chancellor at equity were two different people with distinct purviews, and this esoteric distinction persisted even after the powers of law and equity were united in the single person of a federal district judge.  In modern times, the distinctive feature of the *Enelow-Ettelson* doctrine was its stubborn preservation of this distinction between law and equity long after the Federal Rules of Civil procedure had formally abolished it.  *See, e.g., Houston General Ins. Co. v. Realex Group N.V.*, 776 F.2d 514, 515 (5th Cir. 1985) (citing *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 418-419 (5th Cir. 1985)).  In *Gulfstream*, the Supreme Court overruled the "Byzantine" *Enelow-Ettelson* doctrine, holding that "orders granting or denying stays of 'legal' proceedings on 'equitable' grounds are not automatically appealable under § 1292(a)(1)." 485 U.S. at 287, 108 S. Ct. at 1142.  In eliminating the *Ennelow-Ettelson* exception, the Supreme Court disposed of a doctrine "deficient in utility and sense" and set forth a uniform standard establishing the non-appealability of stays.  485 U.S. at 282, 108 S. Ct. at 1140.

Soon thereafter, we applied *Gulfstream* to arbitration in

13

*Jolley v. Paine Weber Jackson & Curtis, Inc.*, holding that "an order denying [or granting] a stay pending arbitration is not appealable under § 1292(a)(1)." 864 F.2d 402, 403 (5th Cir. 1989) (citation omitted) *supplemented at* 867 F.2d 891 (5th Cir. 1989); *Turboff v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 867 F.2d 1518, 1520 (5th Cir. 1989) (stating that there is no appellate jurisdiction over orders granting or denying stays pending arbitration). Consequently, under *Gulfstream* and its progeny, the district court's order staying the instant case and ordering arbitration was not in essence an affirmative injunction to arbitrate. It was instead simply an administrative decision by the district court to manage its docket by declining to hear the case until the parties made a good-faith effort to fulfill their mutual, bargained-for expectation that disputes under the CBA or PCA would be heard, at least initially, in arbitration. Accordingly, we do not have appellate jurisdiction over the order under 28 U.S.C. § 1292(a)(1).

## II.

Arguably, however, even though we do not have appellate jurisdiction under section 1291, because the order is not final or within the collateral order doctrine, and is not an appealable order under section 1292(a)(1), or under the FAA, we would still have appellate jurisdiction if the district court wholly lacked jurisdiction so that its order was a complete nullity. *See,*

14

*e.g.*, *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328-29 (5th Cir. 2004).  A federal court is without jurisdiction if the only complaining party lacks standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 553 (1992); *Florida Dept. of Ins. v. Chase Bank of Texas*, 274 F.3d 924, 928-29 (5th Cir. 2001) (". . . standing is a component of Article III's case or controversy requirement, and is jurisdictional in nature").  The Union "as the party invoking federal jurisdiction, bears the burden of establishing the three elements of Article III standing."  *Grant v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003) (citing *Lujan*, 504 U.S. at 561).  As we stated in *Florida Dept. of Ins.* at 929:

> "As articulated by the Supreme Court in *Lujan v. Defenders of Wildlife*, the elements of constitutional standing are: (1) that the plaintiff have suffered an 'injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent"; (2) that there is 'a causal connection between the injury and the conduct complained of"; and (3) that the injury is likely to be redressed by a favorable decision.  Under *Lujan*, courts must carefully examine whose injury is at issue, and to whom the recovery will go.  If the plaintiff is not the party who sustained the concrete and particularized injury for which a remedy is sought, and is not the assignee or designated representative of the injured party, then it does not have standing."  (footnotes omitted).

Goodrich in effect contends as a matter of statutory construction that the Union could not have sustained an injury in fact because it is only authorized by statute to bring suit on behalf of active employees, meaning that unions are, at least in

15

a technical legal sense, incapable of suffering an injury when company action redounds only to the detriment of retirees. In support of this contention, Goodrich repeatedly emphasizes the plain language of Section 301(b): "Any [] labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States."

Goodrich's position is not without considerable force. The statutory definition of employee does not include retired former employees.[5] In addition, the Supreme Court has held that retirees are not "employees" for the purposes of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169 and, consequently, the issue of benefits extended to current retirees is not a subject of mandatory bargaining under the NLRA. *Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass*, 404 U.S. 157, 172, 92 S. Ct. 383, 394 (1971) ("In this cause, in addition to holding that pensioners are not 'employees' within the meaning of the collective-bargaining obligations of the [NLRA], we hold that they were not and could not be

---

[5] "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer...and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice..." 29 U.S.C. § 152(3).
Though the definitions supplied at 29 U.S.C. § 152 expressly state that they apply only to the subchapter of the Labor Management Relations Act entitled the National Labor Relations Act, 29 U.S.C. §§ 151-169, which does not include Section 301(b), those same definitions have been made applicable to the entire LMRA by 29 U.S.C § 142(3).

'employees' included in the bargaining unit."). If, as *Pittsburgh Plate Glass* establishes, the statutory definition of the term "employee," found at 29 U.S.C. § 152(3), is too narrow to allow the Union to compel Goodrich to engage in good-faith mandatory bargaining over changes to the benefits of retirees, then it must also be true that the Union cannot hail Goodrich into court on the strength of its claim that the term "employees" in Section 301(b), which is also defined at 29 U.S.C. § 152(3), can be broadly read to include retirees.

This conclusion finds support in our decision in *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1270 (5th Cir. 1990), in which we held that a Section 301 suit brought by a union purportedly on behalf of all retirees was not *res judicata* as to a retiree who did not know about, much less participate in, the union's suit. We reasoned, based on *Pittsburgh Plate Glass* and many other cases, that a labor organization does not have the statutory authority to act as the exclusive and binding agent of a retiree in the same way that a union can so act on behalf of its active bargaining-unit members. *Id.* at 1268-1272. *See also Rossetto v. Pabst Brewing Co., Inc.*, 128 F.3d 538, 541 (7th Cir. 1998); *Merk v. Jewel Cos.*, 848 F.2d 761, 766 (7th Cir. 1988). On the other hand, the Third Circuit in *United Steelworkers v. Canron*, 580 F.2d 77, 81 (3d Cir. 1978), held that in a section 301 suit "the plaintiff-union has standing to represent the retirees in seeking

17

arbitration under its labor contract with" the defendant-employer.

However, we need not here ultimately resolve whether *Canron* should be followed or is consistent with the statutory scheme or our *Meza* decision. We hold that the Union has standing under section 301 to represent the fifty-two retirees whose express authorizations of the Union to do so were filed with the district court below, and that accordingly the district court was not so lacking in jurisdiction that its challenged order becomes appealable on that basis. *Cf*. *Kelly v. Moore*, 376 F.3d 481, 484-85 (5th Cir. 2004) (order granting new trial erroneous but not void, and hence interlocutory and not appealable).

Our conclusion as to the Union's standing to represent those authorizing retirees does not follow from a single decisive principle. It is instead the sum of several considerations which, in our view, tip the scale in favor of standing to represent those retirees.

First, Goodrich's emphasis on the plain language of Section 301 is unavailing in this context. Though it is true as a general principle that plain language controls statutory interpretation, *see, e.g., Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002), the Supreme Court has carved out an exception in the case of Section 301 and retirees. The Court has read Section 301 expansively to include a right of action by retirees against

18

their former employers even though the plain language of Section 301 only creates a right of action for unions against employers and union members against their unions. *Pittsburgh Plate Glass*, 92 S. Ct. at 399 n.20 ("The retiree [has] a federal remedy under § 301 of the [LMRA] for breach of contract if his benefits were unilaterally changed.") (citations omitted)). Indeed, neither party disputes that the retirees have cognizable claims against Goodrich under the CBA and PCA. Therefore, given that the fifty-two retirees in this case have viable causes of action against Goodrich despite the plain language of Section 301, we do not consider that same plain language to be an impediment to suit by the Union when the Union has the express consent of the retirees to represent them therein.

Next, cases like *Pittsburgh Plate Glass* and *Meza*, which restricted the scope of a union's authority to act as the binding bargaining agent of retirees, stand for the proposition that unions cannot overreach and arrogate to themselves power that Congress has not clearly given them. *See also Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1484-1485 (6th Cir. 1983) (holding that retirees are entitled to settle a claim against the company arising under a CBA even when the retirees' former union has a suit pending on the same issue), *cert. denied* 465 U.S. 1007 (1984). We find that this concern is not implicated by holding that unions may bring a section 301 suit on behalf of retirees

19

who have authorized the union to do so on their behalf.  Nothing in our decision today would authorize a union to sue *on behalf* of individual retirees *but against* their wishes.  *See Anderson v. Alpha Portland Indus.*, 752 F.2d 1293, 1296 (8th Cir.) (en banc) (stating that the law does not "establish that a union which does bargain for its retirees becomes their *exclusive* representative and that the retirees then *must* proceed through the union.") (emphasis in original), *cert. denied* 471 U.S. 1102 (1985); *Merk*, 848 F.2d at 766 ("[U]nions may bargain on behalf of retirees if the employer is willing, although the retirees need not accept the offer of representation.  Former employees might choose the union as their agent for purposes of implementing or compromising claims arising under a [CBA].").  Nor have we held that a union may sue on behalf of a retiree who has not consented.[6]

Finally, Section 301 is not simply a procedural statute but

---

[6] The Seventh Circuit specifically addressed the question of union standing under Section 301 to represent retirees and concluded, that there is no standing unless the retirees consent to representation.  *Rossetto*, 128 F.3d at 541.  The *Rossetto* court went one step further, however, and held that a union's standing in federal court also depends on whether the company, in addition to the retirees, has consented to union representation of the consenting retirees.  *Id.*  The *Rossetto* court cites no authority for the proposition that a plaintiff's Article III standing depends on consent of the defendant, and we decline to follow that aspect of the opinion's holding.  Given that a defendant cannot give standing where is it does not properly exist, *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 255 (1994) (stating that standing is jurisdictional and, hence, not subject to waiver), it follows *a fortiori* that a defendant cannot take away standing where it does properly exist.

a source of substantive labor law. *Textile Workers Union of America v. Lincoln Mills of Ala.*, 77 S. Ct. 912, 917-918 (1957). The Supreme Court has instructed the courts to fashion this common law with an eye toward the overarching themes of federal labor policy. *Id.* at 918 ("We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws."). Our holding today is consistent with that policy. Granting the Union standing to represent the consenting fifty-two retirees provides a convenient vehicle for litigating their collective claim that Goodrich has failed to honor contractual rights that have vested under the CBA and PCA. Furthermore, finding standing recognizes that the Union, as both signatory to the CBA and PCA and former exclusive agent of retirees, has a legitimate interest in honoring the request of the retirees that it represent them to enforce their rights that it and Goodrich provided for in the CBA and PCA. These interests, while not dispositive, lend marginal additional support to our conclusion that granting limited standing to the Union to represent the consenting fifty-two retirees is consistent with national labor policy.

## Conclusion

For the foregoing reasons, we conclude that we lack jurisdiction to review the district court's order. Accordingly, the appeal is

21

DISMISSED FOR WANT OF APPELLATE JURISDICTION.