United Steel v. Cookson America, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: February 5, 2013          Decided: March 18, 2013)

Docket No. 12-1032-cv

_____

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC,

*Plaintiff-Appellee*,

v.

COOKSON AMERICA, INC., VESUVIUS USA CORPORATION,

*Defendants-Appellants.*

_____

Before: WALKER, KATZMANN, *Circuit Judges*, and PRESKA, *District Judge.*[*]

Appeal from a judgment entered on February 28, 2012 by the United States District Court

for the Western District of New York (Skretny, *J.*), which denied the motion of Defendants-

Appellants Cookson America, Inc. ("Cookson") and Vesuvius USA Corporation ("Vesuvius")

for summary judgment and granted the cross-motion of Plaintiff-Appellee United Steel, Paper

and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

_____

[*]The Honorable Loretta A. Preska, of the United States District Court for the Southern District of
New York, sitting by designation.

International Union, AFL-CIO/CLC ("the Union"). We hold that the district court correctly interpreted the parties' agreement and that the Union, as a party to that agreement, had standing to enforce it even where the benefits of enforcement accrued to third-party retirees.

**AFFIRMED**.

_____

| | |
|---|---|
| Counsel for Plaintiff-Appellee: | DANIEL M. KOVALIK, Senior Associate General Counsel (Katharine J. Shaw, Assistant General Counsel, *on the brief*), United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, Pittsburgh, PA. |
| Counsel for Defendants-Appellants: | NEAL J. MCNAMARA, Nixon Peabody LLP, Providence, RI. |

_____

PER CURIAM:

In this case, we are called upon to construe an agreement between the parties and to determine whether the Union, as a party to the relevant agreement, has standing to enforce it even where the benefits of enforcement accrue to third-party retirees. Cookson and its wholly owned subsidiary, Vesuvius, appeal from a judgment entered on February 28, 2012 by the United States District Court for the Western District of New York (Skretny, *J.*). That judgment enforced the district court's February 25, 2012 Decision and Order, which denied Cookson's and Vesuvius's motion for summary judgment and granted the cross-motion of the Union. In 2008, Cookson and Vesuvius (collectively, "the companies") closed a facility that Vesuvius had operated in Hamburg, New York. Vesuvius and the Union entered into a Facility Closure Agreement ("FCA"). They now dispute whether that agreement required Vesuvius to pay a

retiree medical allowance ("RMA") to certain eligible employees. The district court held that the FCA imposed such a requirement. On appeal, the companies argue (1) that the district court misinterpreted the FCA, (2) that the FCA did not unambiguously indicate that any right to receive a RMA survived the parties' collective bargaining agreement ("CBA"), and (3) that the Union, which no longer represents the retirees, lacks standing to assert the relevant claim. For the reasons set forth below, we affirm the district court's judgment.

## I.    Background

From 1992 until 2008, Vesuvius operated a steel plant and foundry in Hamburg, NY. The Union represented the employees at the Hamburg plant. In 1994, Vesuvius and the Union negotiated a CBA. That CBA provided that employees "hired prior to March 15, 1994 who ultimately retire from the Company, and reach age 65, will upon reaching age 65 be eligible to receive a one time medical benefit allowance of seven thousand dollars ($7,000)." Appellee's Br. at 5; *see also* J. App'x at 82. In 2004, the parties increased the amount of the RMA to $8,000.

In August of 2007, Vesuvius announced that it would close the Hamburg plant in approximately one year. Subsequently, the parties began negotiating the FCA. Vesuvius initially proposed an agreement that did not provide for the continuing payment of RMAs to eligible employees. The Union objected, and the FCA ultimately provided that: "The Company shall honor the Retiree Medical Allowance provision of the CBA." J. App'x at 90. The FCA further provided that the existing CBA between the parties ("the 2004 CBA"), which also required payment of RMAs, would "remain in effect on [its expiration date] and thereafter and w[ould] be terminated when the last bargaining unit member of the Company located at the [Hamburg] facility is terminated." *Id.* at 89. The FCA did not provide for its own termination.

The Hamburg plant closed in August 2008. Between August 2008 and December 31, 2010, Vesuvius paid RMAs to the approximately six eligible employees who reached the age of sixty-five. On December 30, 2009, however, Cookson notified employees that, "After a thorough study of costs and plan design, we have concluded that, effective January 1, 2011, Cookson will no longer provide a one time retiree medical allowance at age 65 to employees hired prior to March 15, 1994 and who ultimately retire from the Company." *Id.* at 96.

On January 19, 2010, the Union sued Cookson and Vesuvius, seeking a declaration that the FCA obligated the companies to pay RMAs to the thirty-six potentially eligible retirees from the Hamburg plant who had yet to reach the age of sixty-five. The parties cross-moved for summary judgment on March 10, 2011. The district court held that, because the parties' CBA remained operative until the Hamburg plant closed, the provision of the FCA that required Vesuvius to "honor the Retiree Medical Allowance provision of the CBA" necessarily required it to do so after the closure of the Hamburg plant. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Cookson Am., Inc.*, No. 10-CV-041S, 2012 WL 639616, at *3 (W.D.N.Y. Feb. 27, 2012). The district court also rejected the companies' challenge to the Union's standing, reasoning that the Union could sue as a party to the FCA. *Id.* at *4. Accordingly, the district court granted the Union's motion for summary judgment and denied the companies' cross-motion.

Cookson and Vesuvius now appeal from that decision.

## II.     Discussion

"We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable

inferences in its favor." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005). "We will affirm the judgment only if there is no genuine issue as to any material fact, and if the moving party is entitled to a judgment as a matter of law." *Id.*

Under 29 U.S.C. § 185(a), federal courts may hear suits "for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." "When courts interpret [such contracts], traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). "[A]s with all contracts, courts should attempt to read CBAs in such a way that no language is rendered superfluous." *Id.*

Here, the FCA required Vesuvius to "honor the Retiree Medical Allowance provision of the" 2004 CBA. J. App'x at 90. The FCA also provided that the 2004 CBA, instead of expiring before the facility's closure, would "remain in effect" until "the last bargaining unit member of the Company located at the [Hamburg] facility is terminated." *Id.* at 89. Because the 2004 CBA contained the initial requirement that Vesuvius pay a RMA, and continued to require Vesuvius to make such payments until the facility closed, the FCA's independent provision could only have required Vesuvius to "honor" the parties' arrangement after the facility's closure. *See Aeronautical Indus. Dist. Lodge 91*, 230 F.3d at 576.[1]

---

[1]The companies argue that their proposed interpretation of the FCA does not render the language in question superfluous. They base this argument on the claim that the FCA, in fact, imposed an independent requirement on Vesuvius to pay a RMA before the facility's closure. They note that the FCA also provided that, if the facility had not closed by August 28, 2008, the Union could begin negotiating a new CBA. According to the companies, had a newly negotiated CBA not imposed the same requirements as the 2004 CBA, the FCA would have still required Vesuvius to pay the RMA. But the companies do not explain why a newly negotiated CBA might not have required payment of the RMA—which had been a part of the parties' CBAs since 1994—much less why the parties would have prepared for that remote possibility when drafting the FCA.

-5-

The companies object to this conclusion for two reasons. First, they argue that, because Vesuvius closed the facility, the employees who worked there did not "retire" within the meaning of the 2004 CBA, and thus have no entitlement to RMAs. Nonetheless, since this interpretation of the relevant provisions would prevent any employee who worked at the facility until its closure from claiming a RMA, it would also render the relevant language in the FCA superfluous. Moreover, the companies have not cited to any case in which an employer has escaped its obligation to pay retirement benefits to otherwise eligible employees simply by laying them off.

Second, the companies argue that Vesuvius may refuse to pay the RMA because, "after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 979 (2d Cir. 1997). According to the companies, only when a CBA "unambiguously indicates" a continuing entitlement to benefits will courts require payment of those benefits after the CBA's expiration. *Id.* at 980. Here, however, the FCA imposes the relevant requirement. Unlike the 2004 CBA, the FCA does not provide for its own expiration. What the expiration of the CBA might entitle Vesuvius to do, then, is inapposite. Because the FCA imposes a continuing obligation, Vesuvius must meet that obligation on a continuing basis.

Finally, the companies argue that the Union lacks standing to bring the claims at issue because it no longer represents the relevant employees, who have all retired. "Standing generally has two aspects: constitutional standing, a mandate of the case or controversy requirement in Article III [of the United States Constitution], and prudential considerations of standing, which involve judicially self-imposed limits on the exercise of federal jurisdiction." *Lerner v. Fleet*

*Bank, N.A.*, 318 F.3d 113, 126 (2d Cir. 2003) (internal quotation marks omitted). The relevant prudential considerations of standing include so-called "statutory standing," *i.e.*, "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* (internal quotation marks omitted).

We turn first to constitutional standing. To demonstrate such standing, a plaintiff must show (1) that it has suffered "an injury in fact" that is "concrete and particularized" as well as "actual or imminent," (2) that there is "a causal connection between the injury and the conduct complained of," and (3) "that the injury will [likely] be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). The Union satisfies these requirements. Because the Union was a party to the FCA, Cookson's refusal to pay retiree benefits under that agreement will injure the Union by depriving it of the benefit of its bargain. That this benefit accrues to third parties, namely, the retirees, does not change the fact that the Union has negotiated for the benefit and has incurred obligations in order to secure it. *See Frontier Comm'cns of N.Y., Inc. v. IBEW, AFL-CIO*, No. 07 Civ. 10327, 2008 WL 1991096, at *3 (S.D.N.Y. May 6, 2008) ("It is axiomatic that a party to an agreement has standing to sue a counter-party who breaches that agreement, even where some or all of the benefits of that contract accrue to a third party." (internal quotation marks omitted)). Moreover, Cookson's refusal to pay the RMA will cause the Union's injury, and a decision declaring that the FCA obligates Cookson to pay will redress that injury. Accordingly, the Union has constitutional standing to sue to enforce the FCA. This conclusion is consistent with the decisions of other Circuit Courts of Appeals. *See, e.g.*, *Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*, 440 F.3d 809, 815 (6th Cir. 2006); *United Steelworkers v. Canron, Inc.*, 580 F.2d 77, 81 (3d Cir. 1978).

Turning to statutory standing, 29 U.S.C. § 185(a) gives federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." Section 185(b), in turn, permits a "labor organization" to "sue or be sued as an entity and in behalf of the employees whom it represents." Here, the Union has sued the companies "for violation" of the FCA, which qualifies as a contract "between an employer and a labor organization representing employees in an industry affecting commerce." The Union also satisfies the requirements of § 185(b) because it sues "as an entity" to vindicate its own contractual interests. *See Frontier Comm'cns of N.Y.*, 2008 WL 1991096, at *3.[2] Thus, the Union has statutory standing because its "complaint fall[s] within the zone of interests protected by the law invoked." *Lerner*, 318 F.3d at 126.

*Schweizer Aircraft Corp. v. Local 1752*, 29 F.3d 83 (2d Cir. 1994), on which the companies rely, is not to the contrary. In *Schweizer*, we noted in dicta that the Supreme Court had previously held that retirees do not qualify as part of a union's bargaining unit under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq. See* 29 F.3d at 87; *see also Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20 (1971). The exclusion of retirees from a union's bargaining unit, however, means only that an employer need not bargain with retirees on a collective basis. *Id.* at 164. As the Third Circuit has explained, the mere fact that retirees are not a part of a union's bargaining unit does not prevent employers from contractually obligating themselves to pay retirement benefits. *Canron*, 580 F.2d

---

[2]We need not decide whether § 185(b) also requires the Union to sue "in behalf of the employees whom it represents" because, even assuming *arguendo* that § 185(b) does impose such a requirement, the Union meets that requirement for the reasons described below. *See Allied Chem. & Akali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20 (1971) (noting that retirees may "have a federal remedy under [29 U.S.C. § 185] for breach of contract").

at 80-81 (discussing *Allied Chemical*). Where employers have undertaken such contractual obligations, "accepted contract principles" indicate that a "union has a legitimate interest in protecting the rights of the retirees and is entitled to seek enforcement of the applicable contract provisions." *Id.* The Third Circuit's conclusion is supported by the Supreme Court's observation, in *Allied Chemical*, that "the future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining." 404 U.S. at 180.

We note that several other Circuit Courts of Appeals have held that a union's standing to represent retirees may turn on whether it has obtained the retirees' consent to litigate on their behalf. *See Cleveland Elec. Illuminating Co.*, 440 F.3d at 817; *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 541 (7th Cir. 1997); *see also Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 2121 v. Goodrich Corp.*, 410 F.3d 204, 213 (5th Cir. 2005). *But see IBEW, AFL-CIO Local 1245 v. Citizens Telecomm. Co.*, 549 F.3d 781, 786-88 (9th Cir. 2008) (disagreeing with *Rossetto* and *Cleveland Electric*); *Canron*, 580 F.2d at 80-81 (upholding a union's standing without finding that the retirees had consented to the suit). The unique circumstances of this case, however, do not present the concerns that motivated the imposition of a consent requirement. Thus, we need not decide whether those concerns, where present, would lead us to adopt such a requirement. First, because the Hamburg plant has closed, there is no "potential for conflict between the interests of retirees and the interests of active employees." *Rossetto*, 128 F.3d at 540 n.2. In the absence of any conflicts of interest, we have no reason to believe that the Union has acted "against [retirees'] wishes," thereby "arrogat[ing] to [itself] power that Congress has not clearly given." *Goodrich*, 410 F.3d at 213. Finally, given that the plant's

-9-

closure has capped the number of eligible retirees at thirty-six, we need not worry about the possibility of future suits by individual retirees who lack notice of the present case. *See Cleveland Elec.*, 440 F.3d at 817; *see also Goodrich*, 410 F.3d at 212 (noting that a union's suit "was not *res judicata* as to a retiree who did not know about, much less participate in," the suit). Thus, because the instant suit does not implicate the concerns that animated the decisions of the Fifth, Sixth, and Seventh Circuits, those concerns cannot support the conclusion that the Union here lacks standing to represent these particular retirees.

## III.    Conclusion

Accordingly, for the foregoing reasons, the judgment of the district court is hereby **AFFIRMED**.