NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Public Employee Labor Relations Board
No. 2014-0801


APPEAL OF CITY OF CONCORD
(New Hampshire Public Employee Labor Relations Board)

Argued:  September 16, 2015
Opinion Issued:  January 26, 2016


City Solicitor's Office, of Concord (James W. Kennedy, city solicitor, on the brief and orally), for the petitioner.


Milner & Krupski, PLLC, of Concord (John S. Krupski on the brief and orally), for the respondent.


HICKS, J.  The petitioner, the City of Concord (City), appeals a decision of the New Hampshire Public Employee Labor Relations Board (PELRB) that a grievance filed by the respondent, the Concord Police Supervisor[s'] Association (Union), and a retired bargaining unit member is arbitrable pursuant to the parties' collective bargaining agreement (CBA).  We affirm.

The pertinent facts follow.  The City and the Union were parties to a CBA that expired on December 31, 2012.  Lieutenant Paul Leger retired on January 31, 2013, while negotiations for a successor CBA were ongoing.  Negotiations for the successor CBA culminated in an agreement signed on December 19, 2013, nearly eleven months after Leger retired.  The successor CBA gives certain employees a 2.25% cost-of-living wage adjustment (COLA), retroactive to January 1, 2013, and establishes a grievance procedure ending in binding

arbitration. The successor CBA states that it covers the period from January 1, 2013, to December 31, 2015, but also provides that it will be in "full force and effect" from the date on which "it is ratified and signed by both parties." For ease of reference, we refer to the CBA that expired on December 31, 2012, as "the expired CBA" and to the CBA that was signed on December 19, 2013, as "the successor CBA."

In March 2014, more than a year after Leger retired, he and the Union filed a grievance with the City because he did not receive the COLA effective January 1, 2013 (the Leger grievance). The City denied the grievance, and the Union subsequently demanded arbitration.

In April 2014, the City filed an unfair labor practice complaint with the PELRB, alleging that the Union's demand for arbitration constituted an unfair labor practice under RSA 273-A:5, II(f), (g) (2010) because the Leger grievance was not arbitrable under the terms of the successor CBA. The PELRB dismissed the City's unfair labor practice complaint and found the grievance arbitrable because it could not "say, with positive assurance, that the [successor] CBA is not susceptible of an interpretation which covers the Leger grievance." The City unsuccessfully moved for rehearing, and this appeal followed.

The issue before us is limited to whether the PELRB erred when it concluded that the Leger grievance is arbitrable under the successor CBA and, therefore, that the Union did not commit an unfair labor practice when it submitted the arbitration demand. The parties argue the merits of the grievance, but those arguments are not properly before us. See Appeal of Town of Bedford, 142 N.H. 637, 639 (1998); see also AT&T Technologies v. Communications Workers, 475 U.S. 643, 649-50 (1986). Although the Union implies that the PELRB lacked jurisdiction to decide arbitrability, it is well-settled that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the PELRB, not the arbitrator." Appeal of Town of Durham, 149 N.H. 486, 488 (2003) (quotation and brackets omitted). The Union fails to identify where the parties "clearly and unmistakably" agreed that arbitrability was to be decided by the arbitrator.

RSA chapter 541 governs our review of PELRB decisions. See RSA 273–A:14 (2010); RSA 541:2 (2007). Under RSA 541:13 (2007), we will not set aside the PELRB's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable. Appeal of N.H. Retirement System, 167 N.H. 685, 689-90 (2015). The PELRB's findings of fact are presumed prima facie lawful and reasonable. RSA 541:13. "In reviewing the PELRB's findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the findings are supported by competent evidence in the record."

Appeal of N.H. Retirement System, 167 N.H. at 690 (quotation omitted).  We review the PELRB's rulings on issues of law de novo.  Id.

We will not reverse the PELRB's decision that the grievance in this case is arbitrable "unless we can say with positive assurance that the CBA's arbitration clause is not susceptible of a reading that will cover the dispute." Appeal of City of Nashua, 132 N.H. 699, 701 (1990).  Other principles guiding our analysis include:  (1) arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute that it has not agreed to submit; (2) unless the parties clearly state otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator; (3) a court should not rule on the merits of the parties' underlying claims when deciding whether they agreed to arbitrate; and (4) under the "positive assurance" standard, when a CBA contains an arbitration clause, a presumption of arbitrability exists, and in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.  Appeal of Town of Bedford, 142 N.H. at 639 (quotation omitted); see AT&T Technologies, 475 U.S. at 648-50.

Under the positive assurance standard, we may conclude that the arbitration clause does not include a particular grievance only if we determine with positive assurance that the CBA is not susceptible of an interpretation that covers the dispute.  Appeal of Town of Bedford, 142 N.H. at 640; see AT&T Technologies, 475 U.S. at 650.  However, the principle that doubt should be resolved in favor of arbitration does not relieve us of the responsibility of applying traditional principles of contract interpretation in an effort to ascertain the intention of the contracting parties.  Appeal of Town of Bedford, 142 N.H. at 640.

To determine whether the subject grievance is arbitrable, we first examine the relevant language of the CBA as that language reflects the parties' intent.  Id. at 641.  "This intent is determined from the agreement taken as a whole, and by construing its terms according to the common meaning of their words and phrases."  Id. (quotation omitted).

We begin with Article XVII of the successor CBA, which sets forth a four-step grievance procedure.  That article defines a "grievance . . . as a claim or dispute by an Employee arising out of the application or interpretation of this Agreement, under express, written provisions of this Agreement."  The first step of the grievance process requires an "Employee" to "notify the Deputy Chief in the Employee's chain of Command of the grievance."  The grievance proceeds to step two of the process if it "remains unresolved following the decision of the Deputy Chief."  At step two, the grievance is then submitted in writing to the Police Chief.  The grievance proceeds to step three if it "remains unresolved following the decision of the Police Chief."  At step three, "the UNION may

3

submit said grievance to arbitration."  Step four governs the binding arbitration process itself.

Article XVII specifies that certain disputes are expressly excluded from the grievance process.  Pursuant to Section 8 of Article XVII, excluded from the grievance process are "[q]uestions involving the City Charter, City Ordinances, published policies and regulations, provisions of RSA 273-A and other provisions of law or policies and regulations of appropriate authorities outside the City."  Also excluded from the process is "any matter for which statutory appeals procedures exist."

The grievance and arbitration provision, thus, limits arbitration to "grievance[s]," defines "grievance[s]" as disputes or claims by "Employee[s]," and specifies that the dispute or claim must arise out of "the application or interpretation" of the successor CBA "under [its] express, written provisions."

To determine who is an "Employee," we examine Article II of the successor CBA, which is the recognition clause.  That article provides, in relevant part, that the Union is "the exclusive bargaining agent for all full time non-probationary Police Sergeants, Police Lieutenants, non-probationary Parking Supervisors and non-probationary Dispatch Supervisors or their successor titles (herein after called 'Employees' as defined pursuant to RSA 273-A:1)."  The recognition clause, thus, defines the word "Employee" by identifying the bargaining unit positions to which the word refers and by incorporating, by reference, the statutory definition of "Public employee," RSA 273-A:1, IX (2010).

In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of the statute considered as a whole.  Appeal of Laconia Patrolman Assoc., 164 N.H. 552, 555 (2013).  When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used.  Id.  Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme.  In the Matter of Liquidation of Home Ins. Co., 166 N.H. 84, 88 (2014).  We review the PELRB's statutory interpretation de novo.  See Appeal of Town of Deerfield, 162 N.H. 601, 602 (2011); see also Appeal of State Employees' Assoc. of N.H., 156 N.H. 507, 510 (2007) (explaining that we no longer defer to the PELRB's statutory interpretation).

The Public Employee Labor Relations Act (PELRA) defines a "Public employee" as a person "employed by a public employer."  RSA 273-A:1, IX. This definition does not include a retiree because a retiree is no longer "employed."  See Chemical Workers v. Pittsburgh Glass, 404 U.S. 157, 168 (1971); see also Garcia v. City of Hartford, 972 A.2d 706, 713 (Conn. 2009) (explaining that "[t]he meaning ascribed to the term employee under labor law is consistent with its common meaning").  Black's Law Dictionary defines an

"employee" as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire." Black's Law Dictionary 639 (10th ed. 2014). Likewise, Webster's Third New International Dictionary defines an "employee" as "one employed by another" and "any worker who is under wages or salary to an employer." Webster's Third New International Dictionary 743 (unabridged ed. 2002). "The ordinary meaning of 'employee' does not include retired workers" because such workers "have ceased to work for another for hire." Pittsburgh Glass, 404 U.S. at 168; see In re Crafts Precision Industries, Inc., 244 B.R. 178, 184 (B.A.P. 1st Cir. 2000) (relying upon Black's Law Dictionary definition and Pittsburgh Glass, court states "that retired persons are not included in the ordinary meaning of the word 'employee'").

Although the Union suggests that in Rochester School Board v. New Hampshire PELRB, 119 N.H. 45 (1979), we held that retirees are "[p]ublic employees" under the PELRA, the Union is incorrect. As we explained in Appeal of Johnson, 164 N.H. 598, 603-04 (2013), in Rochester School Board, "we held only that the PELRB had jurisdiction to adjudicate the back-pay claims of former employees," and although "we may have implied that the retired employees in that case constituted 'public employees' under the PELRA, we did not so hold." Thus, the Union is mistaken to the extent that it asserts that in Rochester School Board, we "chose not to follow" the Supreme Court's reasoning and holding in Pittsburgh Glass.

Indeed, in construing the term "Public Employee" as used in the PELRA, we find Pittsburgh Glass persuasive. In that case, the Supreme Court concluded that the word "employees" as used in the National Labor Relations Act (NLRA) does not include retirees. Pittsburgh Glass, 404 U.S. at 168. In reaching this conclusion, the Court relied not only upon the plain meaning of the term, but also upon the purpose of the NLRA, which the Court determined is to prevent the disruption of commerce by dissatisfied workers, and is unrelated to any concern with retirees. Id. at 166. The Court observed that "[t]he inequality of bargaining power that Congress sought to remedy was that of the 'working' [person], and the labor disputes that it ordered to be subjected to collective bargaining were those of employers and their active employees." Id. The Court further determined that "[n]owhere in the history of the [NLRA] is there any evidence that retired workers are to be considered as within the ambit of the collective-bargaining obligations of the statute." Id.

The PELRA was similarly enacted to "foster harmonious and cooperative relations between public employers and their employees." Laws 1975, 490:1 (emphasis added). "To achieve this goal, the [PELRA] granted public employees the right to organize and engage in collective bargaining with their employers, mandated that public employers negotiate in good faith with employee organizations, and established the PELRB to assist in resolving disputes between government and its employees." Appeal of House Legislative Facilities Subcom., 141 N.H. 443, 446 (1996); see Laws 1975, 490:1. Thus, we conclude

that, pursuant to the recognition clause of the successor CBA, a retiree is not an "Employee."

The third provision of the successor CBA relevant to our analysis is Article VII, which sets forth the retroactive COLA at issue. Article VII, entitled "WAGES," provides, in pertinent part, that "employees assigned to the 10 step wage scale shall receive a [COLA] of 2.25%" that is "[e]ffective retroactive to January 1, 2013." This adjustment is reflected in the wage schedule appended to the successor CBA as "Appendix A." Although Article VII grants the retroactive COLA to "employees," it is silent as to when a person has to be an "employee" in order to be entitled to the retroactive COLA.

The last provision of the successor CBA relevant to our analysis is Article XXXIV, which sets forth the term of that CBA. Pursuant to that article, the successor CBA "covers the period from 1/1/13 – 12/31/2015" and "shall not take full force and effect until it is ratified and signed by both parties." Article XXXIV explains that "[t]his means that upon the signing of [the successor CBA] by both parties [its] terms . . . will then be in full force and effect from that date forward only."

Thus, construing the pertinent provisions of the successor CBA, we conclude that: (1) the grievance and arbitration provision restricts arbitration to grievances; (2) the successor CBA defines grievances as disputes or claims by "Employee[s]"; (3) the retroactive COLA at issue was granted to "employees"; and (4) retirees are not "Employee[s]" within the meaning of the CBA.

Nonetheless, we cannot say with positive assurance that the grievance and arbitration provision in the successor CBA is not susceptible of an interpretation that covers the Leger grievance. See Appeal of Town of Bedford, 142 N.H. at 640. This is because the successor CBA is ambiguous as to which "employees" are entitled to the retroactive COLA – those active as of the effective date of the successor CBA or those active at any time during its term. See Granite Rock Co. v. Teamsters, 561 U.S. 287, 301 (2010) (explaining that the presumption of arbitrability applies when "a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand"). On the one hand, the successor CBA can be read to entitle only those employees who were active as of December 19, 2013, the date on which it became effective, in which case Leger — who retired on January 31, 2013 — would not be entitled. On the other hand, the successor CBA can be read to entitle those employees who were active at any time during its term, which began on January 1, 2013, in which case Leger would be entitled. We cannot say, with positive assurance, that the City and Union, having agreed that the COLA would be retroactive to January 1, 2013, did not also agree to arbitrate disputes related to that wage increase for employees who, like Leger, were active at any point during the term of the successor CBA (January 1, 2013, to December 31, 2015). Accordingly, because the successor CBA is ambiguous as to whether it covers the Leger grievance, we apply the presumption of

6

arbitrability and affirm the PELRB's determination that the Leger dispute is arbitrable.  See id.

The City resists this conclusion by focusing upon the fact that Leger was a retiree when the grievance was filed.  "For our purposes, however, who may invoke the arbitration procedure is not as important as what the dispute must be about."  Int'l Broth. of Electrical Workers v. Public Serv., 773 F.3d 1100, 1109 (10th Cir. 2014).  The grievance and arbitration provision of the successor CBA limits arbitrable disputes to those "arising out of the application or interpretation" of that CBA "under [its] express, written provisions."  What makes it possible to interpret the successor CBA to include the Leger grievance is that the grievance is a dispute over the application or interpretation of Article VII, which sets forth the retroactive COLA, and of Article XXXIV, which sets forth the term of the successor CBA.  And as the PELRB found, the grievance and arbitration demand in this case were "based upon . . . Leger's status in January of 2013, when he was still an employee of the City, a public employee under the PELRA, and a member of the . . . bargaining unit."

The City also argues the merits of the Leger grievance, asserting that Leger is not, in fact, entitled to the retroactive COLA because "[u]nder the [successor] CBA, the City and the [Union] agreed that only [Union] employees would earn a retroactive wage increase dating back to January 1, 2013," and the "City never agreed that this benefit would extend to . . . Leger, who retired almost a year earlier, or any other retired [Union] employee."  However, our role is not to decide the merits of the Leger grievance and whether, in fact, he is entitled to the retroactive COLA.  See Appeal of Town of Bedford, 142 N.H. at 639.  Our role is solely to decide whether the PELRB erred when it concluded that the Leger grievance was arbitrable.  See id.  Having concluded that the PELRB did not so err, we leave it to the arbitrator to decide whether Leger is entitled to the retroactive COLA.

Because we do not address the merits of the Leger grievance, we also do not address the City's reliance upon Marcatante v. City of Chicago, Ill., 657 F.3d 433, 441, 443-44 (7th Cir. 2011), which the City contends is factually similar to this case, and supports its assertion that Leger is not entitled to the retroactive COLA.  Whether, as the City asserts, Leger is not entitled to the retroactive COLA because "he was only subject to the terms and conditions set forth in the 2012 CBA," and because the retroactive COLA was not intended to apply to "retired employees who worked during the retroactive pay period," are issues for the arbitrator to resolve in the first instance.

<u>Affirmed</u>.

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.

7